# United States Court of Appeals
## For the First Circuit

No. 15-1764

UNITED STATES OF AMERICA,

Appellee,

v.

KEYON A. TAYLOR, a/k/a Key, a/k/a Keyon Taylor,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Thompson and Barron, Circuit Judges,
and McConnell, District Judge.[*]

Randall E. Kromm, Assistant United States Attorney, and
Carmen M. Ortiz, United States Attorney, on brief for Appellee.
Karen A. Pickett and Pickett Law Offices, P.C. on brief for
Appellant.

February 8, 2017

---

[*] Of the District Court of Rhode Island, sitting by
designation.

**THOMPSON**, **Circuit Judge**.  Keyon Taylor ("Taylor") shot and beat a postal worker, and then hijacked his truck in a botched robbery scheme. The ordeal finally came to an end when the worker popped the truck's rear gate and jumped out of the moving vehicle to try and save his own skin. Taylor was convicted of multiple federal crimes arising from this episode, then sentenced to just shy of thirty years in prison. Taylor now appeals. We affirm on all points but one:  Taylor's Guidelines sentencing range was incorrectly calculated, and so we remand for the limited purpose of permitting the trial court judge to reconsider Taylor's sentence.

### The Facts

Taylor raises many challenges to his conviction and sentence on appeal, but the sufficiency of the evidence is not one of them. So, we give a balanced presentation of those facts necessary to understand the parameters of this appeal and our disposal of it. See United States v. Burgos-Montes, 786 F.3d 92, 99 (1st Cir. 2015), cert. denied, 136 S. Ct. 599 (2015).[1] The details of the crime and the police investigation are important to

---

[1] This issue--how we relate the facts where the appellant does not challenge the sufficiency of the evidence to support the conviction--is unsettled in this circuit. Id. at 99 n.1; United States v. Rodríguez-Soler, 773 F.3d 289, 290 (1st Cir. 2014), cert. denied, 135 S. Ct. 1189 (2015). In this case the standard we apply has no effect on the outcome of Taylor's appeal, so we simply note the issue and move on.

our analysis of Taylor's claims on appeal, so bear with us as we spell them out.

On December 20, 2013, around 6:00 pm, a United States Postal Service letter carrier named Fai Wu was out delivering packages in Dorchester, Massachusetts. As he walked back to his truck, Wu noticed a white van parked behind his vehicle but paid it no mind. He reentered his truck, and while buckling his seatbelt and preparing to move along for the next delivery, he heard a man say "Give me your wallet." Wu turned to his right, and inside his truck was a masked man wearing a dark colored jacket aiming a revolver straight at his head. Obviously assuming an armed robbery was in progress, Wu got up to hand over his wallet. But, concerned for his safety, he also tried to move the revolver away from his scalp. In the entanglement, the man shot Wu in the wrist and then demanded that Wu disclose the location of the "cash drawer." Postal trucks do not have cash drawers. When Wu explained this reality, the man clocked Wu in the head ten to twenty times with the butt of his gun, then repeated the question: "Where's the drawer?" When Wu could not deliver the sought-after prize, the attacker ordered Wu into the back of the truck and again asked for the cash drawer. When Wu still could not deliver, the assailant attacked Wu by repeatedly kicking him.

Eventually the armed attacker ordered Wu to strip off his uniform, to hand over his truck keys, and not to look at him.

The assailant then took the uniform and mopped up some of Wu's blood from the front of the truck before driving it away with Wu still in the back. Wu seized his opportunity to escape when the attacker slowed down to turn a corner: clad only in a sweatshirt, long underwear, and socks, Wu popped the tailgate, jumped off the back of the truck, and hightailed it down the street. As he ran, yelling for help, a still-bleeding Wu spotted the same white van he had previously observed and inadvertently brushed up against it. Wu kept going until he came across a group of pedestrians who called 911.

According to witnesses, the attacker crashed the truck into a snow bank and fled the scene, leaving a visible trail of boot prints and blood behind. Investigators later followed that trail and found, amongst other crime-related items, blood on two chain-link fences; scraps of purple nitrile gloves, including one piece that was stuck to a fence in the blood; and a blood-smeared backyard recycling bin containing Wu's uniform.

After learning of the attack, postal inspectors and police canvassed the area looking for more clues. Witnesses reported that a white U-Haul van was behind the mail truck before and after Wu was attacked. Investigators discovered that a corner market near the crime scene caught the white van on camera: the market's surveillance footage showed the mail truck driving down the block at 5:57 pm, and as soon as the mail truck passed by, a

white U-Haul van turned its headlights on and followed the mail truck around the corner and through a red light.

Later in the evening, when postal inspectors were still out pursuing their investigation, they spotted a white cargo U-Haul van fitting witnesses' descriptions a short distance from the kidnapping scene. They followed it to a gas station and within moments noticed two blood smudges on the outside of the van and a purple nitrile glove in a cup holder. The inspectors learned Maurice Gittens was the driver and Kemron Roache the passenger. When asked what he was doing with the van, Gittens told the postal inspectors he was living in it (though the rear compartment was nearly empty). Both men were transported to the police station for questioning. While there, Gittens told the police, in pertinent part, the following:  the purple glove was not his, but was left in his car by a man named Kurt (whose last name and whereabouts Gittens did not know); yes, he was driving the van that day; at one point he was behind a postal truck and saw a man run from the truck (in the opposite direction of the attacker's flight path); though not positive, he said he picked up Roache around 6:00 pm (shortly before the crime, but two hours before 8:00 pm, the time Roache later claimed Gittens contacted him); and he and Roache drove around together that evening and smoked some marijuana in the park (an alibi).

With his consent, police searched Gittens' phone and found he had called "Cam,"--later determined to be Roache's nickname--around 6:12 pm that night, and that a few minutes later Cam texted "Ima hit you wen to come threw." At 6:31 pm, Cam texted "Where key at." After obtaining a warrant, police searched the van and found several items, including more purple nitrile gloves, an ID card belonging to Sabrina Ramsey--a woman later determined to be Taylor's girlfriend--and a U-Haul rental agreement in the name of "Maurice Williams" but bearing Ramsey's address. When questioned, Ramsey told police that she was with Taylor and Gittens in the white van until 5:00 or 5:30 pm that day, Taylor did not return to her place until 8:00 or 9:00 pm, and Gittens showed up around 4:00 am (after he was questioned) looking for Taylor.

So the police started looking for Taylor, too. In their investigation, they discovered that the then-twenty-year-old suspect worked in an office where purple nitrile gloves were used. They also obtained surveillance footage from the U-Haul rental center showing that Taylor and Gittens rented the white van the day before the attack on Wu. Several days later the police went to Taylor's mother's house, where they found Taylor and other evidence, including a black jacket with a stained sleeve.

DNA testing performed on several seized items showed a lot. Both Taylor and Wu's DNA were found on the black jacket. Wu's uniform retrieved from the recycling bin carried both Wu and

Taylor's blood. The blood on the flight path fences and the recycling bin belonged to Taylor. And, the blood on the outside of the white van belonged to Wu.

## Court Proceedings

Taylor and Gittens were indicted for (1) conspiracy to rob a postal worker under 18 U.S.C. § 371, (2) assault on a federal employee under 18 U.S.C. §§ 111(a)(1) and (b), (3) robbery and attempted robbery under 18 U.S.C. § 2114(a), (4) kidnapping under 18 U.S.C. § 1201(a)(5), (5) attempted kidnapping under 18 U.S.C. § 1201(d), and (6) the use of a firearm in connection with a crime of violence--specifically robbery, attempted robbery, kidnapping, and attempted kidnapping--under 18 U.S.C. § 924(c). Gittens pled guilty before trial to counts 1, 3, and 6, and he was eventually sentenced to ten years' imprisonment.

Taylor opted for trial, wherein he essentially presented a misidentification defense based on how the crime unfolded. As a result of Wu's assailant wearing a mask during the assault and kidnapping, Wu was unable to identify his attacker. Pivoting off this identity problem and trying to sow seeds of reasonable doubt by labeling any evidence of his culpability inconclusive, Taylor argued that Roache better matched Wu's description of the assailant's height and build. And, that fact, coupled with the presence of Roache's fingerprints on the door of the white van and the recovery of Wu's wallet in a neighborhood near Roache's house,

meant Roache had to be the person who robbed and shot Wu. To further support his him-not-me theory, Taylor wanted to use the following evidence: (1) a letter from the government produced during discovery identifying Roache as an unindicted co-conspirator (we call this "the Roache Letter"), and (2) Gittens' statement that he picked up Roache around 6:00 pm that day (we call this "the Gittens Statement"). The trial court ruled both inadmissible.

Sticking with a misidentification defense during his closing argument (which we will address momentarily), Taylor's lawyer gave the jury an alternative explanation of the evidence which described in detail how Roache was more probably the culprit. In response to the defense's closing, the prosecutor's rebuttal harped on why evidence did not support Taylor's Roache-blaming theory. He also emphasized that statements made by Taylor's attorney are not evidence. In the end the jury didn't buy Taylor's defense and convicted him on all counts.

Taylor's Presentence Investigation Report recommended a Guidelines sentencing range of 360 months (30 years) to life in prison, plus a mandatory consecutive ten-year term for Taylor's conviction on count six, using a firearm during a crime of violence. Objecting to the report in a presentencing filing and again during his sentencing hearing, Taylor claimed the Guidelines range was wrong for two reasons: his prior conviction for larceny

from a person is not a crime of violence, and his criminal history score exaggerated the seriousness of his past crimes, most of which he committed as a teenager. The judge rejected Taylor's first argument but agreed with the second and sentenced Taylor to 235 months, plus ten years.

This appeal followed.

## Taylor's Arguments

Taylor raises challenges to several trial happenings: (1) the trial court judge's exclusion of the Roache Letter and the Gittens Statement; (2) the prosecutor's closing argument, which Taylor claims was an improper comment on his failure to testify or present exculpatory evidence; (3) his conviction on count six, for using a firearm during a crime of violence, because he believes the predicate crimes are not crimes of violence under § 924(c); and (4) the procedural reasonableness of his sentence. We address each point in turn.

## The Evidence

Taylor objected to the exclusion of the Roache Letter and the Gittens Statement at trial, so we review both of these evidentiary rulings for abuse of discretion. See Burgos-Montes, 786 F.3d at 114. "Abuse of discretion occurs 'when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable

error of judgment in calibrating the decisional scales.'" United States v. Jiménez, 419 F.3d 34, 43 (1st Cir. 2005) (quoting United States v. Gilbert, 229 F.3d 15, 21 (1st Cir. 2000)).

If the trial court abuses its discretion, the burden falls to the government to show the error was harmless. Burgos-Montes, 786 F.3d at 114 (citing United States v. Meserve, 271 F.3d 314, 329 (1st Cir. 2001)). An error is harmless if it "does not affect [a] substantial right[]," Fed. R. Crim. P. 52(a), meaning it is "highly probable that the error did not contribute to the verdict," United States v. Rose, 104 F.3d 1408, 1414 (1st Cir. 1997).

**The Roache Letter**

Taylor argues that the trial court abused its discretion in excluding the Roache Letter, a letter Taylor urges is admissible as a non-hearsay admission by the prosecution that Roache was a co-conspirator. See Fed. R. Evid. 801(d)(2) (party-opponent admissions are not hearsay). Taylor's theory goes like this:

- Roache did it, or at the very least, the evidence did not prove the perpetrator's identity beyond a reasonable doubt,

- the government's admission that Roache was a co-conspirator bolstered Taylor's defense that Roache was involved,

- so, the evidence was relevant and should have been admitted.

Stating that even if she assumed the Letter could have been admitted under Rule 801(d)(2), the trial court judge barred it nonetheless citing Federal Rule of Evidence 403, which allows the exclusion of otherwise-relevant and admissible evidence if its probative value is "substantially outweighed" by the risk of "confusing the issues" or "misleading the jury." The trial court found that admitting the Letter could lead to "a mini-trial about a side issue"--to wit, why Roache was unindicted--so the risk of confusing the issues substantially outweighed the Letter's probative value. See United States v. George, 761 F.3d 42, 57 (1st Cir. 2014).

Our take: Assuming the Letter was admissible under Rule 801(d)(2) (we do not say that it was), and assuming the trial court judge erred in excluding it under Rule 403 (and we do not say that she did), the error was harmless. The Letter would have done little to help Taylor's defense. At most, it shows that the government believed Roache may have been involved. But the jury already knew that: the postal inspectors testified that they apprehended Roache with Gittens in the white van on the night of the crime, arrested and questioned them both, and found texts and calls to and from "Cam" (Roache's nickname, remember) on Gittens' cellphone.

The Letter's exclusion also did not stop Taylor from pressing his him-not-me theory. On cross-examination of the government's witnesses, Taylor drew out the fact that Roache better

matched the suspect's description, and that police did not test the seized evidence for Roache's DNA. Taylor called his own witnesses to testify that Wu's wallet was recovered near Roache's house, and that Roache's fingerprints were found on the van. Taylor then used his closing argument to try and tie Roache rather than himself to all of the prosecution's other evidence of the crime. For instance, Taylor argued that his DNA ended up along the attacker's flight path and on Wu's uniform because he met up with Roache by the recycling bin after Roache attacked Wu.

The prosecution's evidence, on the other hand, strongly pointed to Taylor. Taylor and Gittens were caught on camera renting the white cargo van together. Taylor worked in an office building that used purple nitrile gloves like the ones found stuck to the fence and in the van. When Wu's attacker fled the scene of the crime, he left a trail of blood leading to a blood-smeared recycling bin where the attacker dumped Wu's uniform mid-flight. The blood found on the flight path, the bin, and the uniform was Keyon Taylor's. Postal inspectors found a black jacket like the one worn by Wu's attacker in Taylor's mother's closet. That jacket contained Taylor's DNA and was stained with Wu's blood. Given the abundance of evidence inculpating Taylor, the government has shown it is "highly probable" that the exclusion of the Roache Letter

did not contribute to the verdict. See Rose, 104 F.3d at 1414. Any error in excluding the Letter was harmless.[2] Id.

## The Gittens Statement

Taylor also claims the trial court abused its discretion in excluding Gittens' statement that he picked up Roache at 6:00 pm (remember, the attack went down around that time). Here's how the issue of the Gittens Statement arose: at trial the prosecution was allowed to admit Gittens' statement to police that he was living in the van as evidence that Gittens lied about why he rented the van. So, Taylor argued that this opened the door for him to introduce another statement Gittens made to police that night-- his statement that he picked up Roache at 6:00 pm--as a statement against interest under Federal Rule of Evidence 804(b)(3) or under the doctrine of verbal completeness. Neither argument persuades.

## 1. The 804(b)(3) Claim

Under Rule 804(b)(3), a hearsay statement against interest may be admissible if it (a) was self-inculpatory when made because it would "expose the declarant to . . . criminal liability," and (b) it "is supported by corroborating circumstances that clearly indicate its trustworthiness." A

---

[2] In a solitary sentence, Taylor asserts that this exclusion prejudiced his Sixth Amendment right to present an adequate defense. Because the argument is undeveloped, it is waived. United States v. Oladosu, 744 F.3d 36, 39 (1st Cir. 2014), cert. denied, 135 S. Ct. 97 (2014).

statement is self-inculpatory under Rule 804(b)(3) if it is "sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.'" United States v. Barone, 114 F.3d 1284, 1295 (1st Cir. 1997) (quoting Williamson v. United States, 512 U.S. 594, 603-04 (1994)). The trial court found the Gittens Statement failed both prongs of the Rule 804(b)(3) analysis, and Taylor takes issue.

For our part, we need not decide today whether the Gittens Statement satisfied the self-inculpatory prong of the 804(b)(3) rule since we conclude that the trial court judge did not abuse her discretion in finding the Statement insufficiently corroborated to be deemed trustworthy, and thus inadmissible. Taylor attacks the trial court's ruling based upon what he says is independent evidence supporting the pick-up-at-6:00 pm Statement's truth. And, noting that the corroboration requirement is not "unrealistically severe," United States v. Mackey, 117 F.3d 24, 29 (1st Cir. 1997), Taylor's corroboration argument goes like this: (a) the government's evidence showed that the van was parked behind Wu's truck during the assault; (b) Gittens says he picked up Roache just before the assault took place; (c) as such, his statement puts Roache (not Taylor) with Gittens at the scene; (d) to boot, the Roache letter demonstrated the government's belief that Roache was involved; and (e) therefore (a) through (d) sufficiently

- 14 -

corroborated the Gittens Statement. We decline to accept Taylor's argument.

The second prong of the Rule 804(b)(3) test requires "meaningful corroboration" of the hearsay testimony. United States v. Monserrate-Valentín, 729 F.3d 31, 52 (1st Cir. 2013) (quoting United States v. Bradshaw, 281 F.3d 278, 286 (1st Cir. 2002)). To establish "meaningful corroboration," "[i]t is not necessary that the corroboration consist of 'independent evidence supporting the truth of the matter asserted by the hearsay statements.'" United States v. Pelletier, 666 F.3d 1, 8 (1st Cir. 2011) (quoting Barone, 114 F.3d at 1300). But, there must be "evidence that clearly indicates that the statements were worthy of belief, based upon the circumstances in which the statements were made." Id. (citation and quotation marks omitted). "[T]he 804(b)(3) corroboration inquiry is concerned only with the admissibility of hearsay evidence based upon its trustworthiness, a determination committed to the sound discretion of the district court." Id. at 9 (quoting Barone, 114 F.3d at 1301).

As we have explained, "[t]he fear that inculpatory statements are unreliable stems largely from the presumption that such statements are self-serving, offered only to shift the blame from the declarant to another," thus we construe the corroboration requirement "in such a manner as to effectuate its purpose of circumventing [such] fabrication." Barone, 114 F.3d at 1301

- 15 -

(citations omitted); see Williamson, 512 U.S. at 601-02. So a statement may be corroborated by the circumstances in which the statement was made if it is "directly against the declarant's penal interest," made to a close associate or family member, or there is no indication that the speaker had motive to lie. Barone, 114 F.3d at 1301; see, e.g., Monserrate-Valentín, 729 F.3d at 53-55 (corroborating circumstances found where statements made to cousins and undercover agent); Pelletier, 666 F.3d at 8-9 (statements made to fellow inmate). On the other hand, statements made to law enforcement officers, or in an apparent attempt by the speaker to shift blame or otherwise "diminish his role in the criminal activity described in the statements," may not necessarily be corroborated by the circumstances. Barone, 114 F.3d at 1301.

The Gittens Statement was made to police. And, as the government argued below, the Statement was made after Gittens was apprehended with Roache and the van on the night of the crime in an apparent attempt to establish an alibi for the time of the attack on Wu and to explain away the presence of the purple nitrile gloves in the van. These circumstances indicate that Gittens had motive to lie and was angling to diminish his role in the events of the evening--in other words, these are the type of circumstances that fail to corroborate.

Taylor does not now address the circumstances in which the Gittens Statement was made. Instead, as previously noted, he points to "independent evidence" that he claims supports "the truth of the matter asserted by the hearsay statements." See Pelletier, 666 F.3d at 8 (quoting Barone, 114 F.3d at 1300). But the problem with his argument is that this type of corroboration requires "indicia of trustworthiness of the specific, 'essential' assertions, not merely of other facts contained in the statement." Mackey, 117 F.3d at 29 (quoting United States v. Zirpolo, 704 F.2d 23, 27 n.4 (1st Cir. 1983)); see, e.g., United States v. Millan, 230 F.3d 431, 437 (1st Cir. 2000). The essential assertion here, and the relevant fact that Taylor wanted to use the Statement to prove, is that Gittens picked up Roache around the time of the crime. Neither the fact that surveillance video showed the white van behind Wu's mail truck, nor the fact that the government said Roache was an unindicted co-conspirator, corroborates the assertion that Gittens, in fact, picked up Roache or that the two of them were together at 6:00 pm.[3] Indeed, as the government points

---

[3] Taylor argues for the first time in his reply brief that text messages between Roache and Gittens corroborate the Gittens Statement. At oral argument the government pointed out that if anything, the messages undermine the Gittens Statement because they indicate Roache and Gittens were not together at the time of the crime. But, Taylor does not cite to the record to support this point, he apparently did not raise it to the district court, and he did not mention it in his opening brief, so the point is waived. United States v. McNicol, 829 F.3d 77, 83 (1st Cir. 2016); Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir.

- 17 -

out, other evidence directly contradicts the essential assertion of the Gittens Statement:  Roache said Gittens did not contact him that night until 8:00 pm.

## 2. The Doctrine of Completeness Claim

In addition to his 804(b)(3) argument, Taylor contends that because the government was allowed to introduce a part of Gittens' conversation with police--the apparent lie that he was living in the van--Taylor should have been allowed to introduce other parts of Gittens' conversation under the doctrine of completeness, which "operates to ensure fairness where a misunderstanding or distortion created by the other party can only be averted by the introduction of the full text of the out-of-court statement." United States v. Simonelli, 237 F.3d 19, 28 (1st Cir. 2001) (quoting United States v. Awon, 135 F.3d 96, 101 (1st Cir. 1998)). But Taylor does not explain what "misunderstanding or distortion" was created by the trial court's admission of Gittens' claim that he was living in the van. Nor does Taylor explain how admitting the Gittens Statement would correct that distortion. Excluding the Gittens Statement under this doctrine was not an abuse of discretion.

---

2015). His argument that the Gittens Statement should have been admissible under Rule 806 to somehow impeach Gittens' claim that he was living in the van is also waived because it was not preserved below.

- 18 -

These evidentiary disputes resolved, we move on to Taylor's next claim of error.

## The Closing Arguments

Taylor argues his conviction should be reversed because the prosecutor's closing arguments were prejudicial. In his rebuttal argument, the prosecutor repeatedly stated that defense counsel cannot testify, or that defense counsel was in fact testifying, and that the evidence in the record did not support Taylor's lawyer's theories. This approach, according to Taylor, was an improper attack on defense counsel that amounted to commenting on Taylor's right not to testify and not to produce evidence.

Because Taylor did not object to the prosecutor's statements at trial, we review for plain error. See United States v. Wilkerson, 411 F.3d 1, 7 (1st Cir. 2005). This means we review to determine whether "an error occurred which was clear or obvious and which not only affected the defendant's substantial rights but also seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id.

A prosecutor may not comment on the defendant's failure to testify in his own defense, nor may a prosecutor imply that the defendant has the burden to produce exculpatory evidence. United States v. Glover, 558 F.3d 71, 77 (1st Cir. 2009). "A prosecutor's remarks violate a defendant's Fifth Amendment guarantee against

self-incrimination if 'in the circumstances of the particular case, the language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" Wilkerson, 411 F.3d at 8-9 (quoting United States v. Wihbey, 75 F.3d 761, 769 (1st Cir. 1996)); see United States v. Hardy, 37 F.3d 753, 757-58 (1st Cir. 1994) (finding "necessary implication" of remark that defendants were running and hiding was that defendants were "hiding behind their right to silence during trial"); Desmond v. United States, 345 F.2d 225, 227 (1st Cir. 1965) (argument that witness was "unimpeached and uncontradicted," where only the defendant could have impeached or contradicted the witness, was a comment on defendant's failure to testify).

But, where the defendant offers an alternate theory of the crime in his own defense, the government may comment on the plausibility of the defendant's theory, provided the comments are focused on the record evidence and not the defendant's failure to produce any. Glover, 558 F.3d at 78. Indeed, "the prosecution may comment on the lack of evidence for a defense theory." United States v. Lyons, 740 F.3d 702, 730 (1st Cir. 2014) (finding no Fifth Amendment violation where prosecutor noted there was "no evidence at all" to support defense theory), cert. denied, 134 S. Ct. 2743 (2014); accord United States v. Niemi, 579 F.3d 123, 128-29 (1st Cir. 2009) (no error where prosecutor posited that defense

- 20 -

counsel could not offer alternate explanation for use of code words in recorded conversation); United States v. Sánchez-Berríos, 424 F.3d 65, 73 (1st Cir. 2005) ("The prosecutor's description of the defense as a 'self serving absurdity,' while not flattering, was fair argument" (citation omitted)); United States v. Bennett, 75 F.3d 40, 46-47 (1st Cir. 1996) (no error in calling defense theory a "diversion" that "doesn't pass the laugh test").

Upon review of the statements, we cannot find Taylor's view--that the prosecutor was commenting on Taylor's failure to testify or produce evidence--is the only, or even a natural reading of the prosecutor's statements. Taylor used his closing argument to illustrate how Roache's involvement could explain the evidence that incriminated Taylor. And, the prosecutor commented on the plausibility of each explanation. For example, Taylor's lawyer said that the assailant's bloody clothes materialized in Taylor's mother's closet in Attleboro not because Taylor put them there, but because Gittens picked up Roache after Roache attacked and kidnapped Wu, then Gittens and Roache put the clothes in the closet. The prosecutor rebutted:

> He's told you that Maurice Gittens picked up Roache, . . . [and] went down to Attleboro. He told you that they put clothes there, clothes that [were] used in the shooting. Did you hear any evidence of that? None. He[, Taylor's attorney,] can't testify, ladies and gentlemen. He's not a witness.

- 21 -

In context, the prosecutor's arguments do not point to Taylor's failure to testify or present evidence; he is simply drawing the jury's attention to "the balance of evidence on the contested issues." Niemi, 579 F.3d at 128-29 (quoting United States v. Stroman, 500 F.3d 61, 65 (1st Cir. 2007)).

The only instance that comes close to implicating Taylor's Fifth Amendment rights came in rebuttal to Taylor's explanation of how his DNA ended up along the attacker's flight path and on Wu's uniform. At trial the prosecutor introduced a surveillance video recorded by a nearby business that showed the white van had parked on Wu's route, then pulled out to follow the mail truck after Wu drove by. Pointing to a person walking down the street in that surveillance video who happened to be wearing a jacket similar to one Taylor owned, Taylor's attorney argued the jacket-wearer was Taylor, that Taylor walked away from the van before the crime occurred because he wanted nothing to do with it, but he met up with Roache by the recycling bin after the crime. In rebuttal, the prosecutor argued:

> So somebody crosses the intersection, they got a stripe on the jacket and automatically it must be Keyon Taylor. And he makes this leap. He says that Keyon Taylor is the person who walked down Clermont Street, this incredible leap, incredible leap . . . There is absolutely no evidence of that, ladies and gentlemen. He[, Taylor's lawyer,] cannot testify. Now, he says that the defendant was there. Really? Really. Did you hear any evidence to that point? He can't testify. He says the defendant

- 22 -

> wanted nothing to do with this. He leaves the van, he walks calmly down the street . . . Really? What evidence of there is that. And he says, Well, you know, maybe he met up with Kemron Roache, maybe he took these articles, maybe it was a dumb decision. What evidence is there of that, ladies and gentlemen?

Arguably this comes closer to implicating Taylor's Fifth Amendment rights than the first example we described above because the alternative explanation of Taylor's whereabouts that night included a time when he was acting alone, and only he could vouch for what he was up to in that moment. A prosecutor's comments about a gap in the evidence can violate a defendant's Fifth Amendment rights if, under the circumstances, it is obvious that only the defendant could have filled the gap. For instance, in Desmond, 345 F.2d at 227, the prosecutor violated the defendant's Fifth Amendment right not to testify with a comment that a witness's testimony was "unimpeached and uncontradicted": the witness testified that he was alone with the defendant, so it was obvious from the circumstances that the defendant was the only person who could have possibly contradicted or impeached the witness, thus the prosecutor's comment could only be understood as a comment on the defendant's silence.

But Taylor does not contend that the prosecutor's remarks resemble those in Desmond. Perhaps that is so because it is "apparent on the record that there was someone other than himself whom the defendant could have called" to fill the

evidentiary gap. United States v. Ayewoh, 627 F.3d 914, 925 (1st Cir. 2010) (citations and internal quotation marks omitted). Here, that person is Roache.[4] In any case, considered in context, the prosecutor's argument is not a comment on Taylor's failure to testify to explain his movements, or his failure to present exculpatory evidence. The prosecutor is, once again, commenting on the balance of the evidence, and the fact that none of it supports Taylor's theory. These comments are fair game.

Taylor's argument that the prosecutor's remarks improperly impugned "the integrity or institutional role of defense counsel," Bennett, 75 F.3d at 46, fails for the same reasons. Taken in context, the prosecutor's statements that defense counsel cannot testify do not amount to an attack on

---

[4] The fact that Roache might not testify to these facts if called to the stand--either because the events did not transpire as claimed by Taylor's lawyer or because Roache might claim his own Fifth Amendment privilege--is immaterial here. At issue is whether the jury would "naturally and necessarily" take the prosecutor's argument as a comment on Taylor's failure to testify. Wilkerson, 411 F.3d at 8-9. If the jury would believe from the circumstances that someone else could testify to the facts at issue, the comments usually will not "naturally and necessarily" point to the defendant's silence. Indeed, we have found that similar comments do not cross the Fifth Amendment line even where no such other person exists. See United States v. Glantz, 810 F.2d 316, 323 (1st Cir. 1987) (finding no error in prosecutor's remark about absence of records, rejecting defendant's argument that comment violated his Fifth Amendment rights because he was the only person who could produce and authenticate records at issue, because "the existence of other 'recordkeeping' witnesses [on other issues at trial] ma[de] it unlikely that the jury would have viewed the challenged comments as pointing to defendants' silence").

Taylor's attorney. The comments simply state the incontrovertible truth--Taylor's attorney's statements are not evidence--a fact that was also included in the jury instructions, where it drew no objection from Taylor.

Plain error is a high bar to clear. Here there was no error, so Taylor's argument falls flat.

### The ACCA Conviction

Taylor raises a slew of challenges to his conviction under 18 U.S.C. § 924(c) of the Armed Career Criminal Act ("ACCA"), which added ten years to his sentence for discharging a firearm during a "crime of violence." Because Taylor did not raise his ACCA challenges before the district court, we review for plain error. See United States v. Reed, 830 F.3d 1, 6 (1st Cir. 2016).

The issue underlying Taylor's 924(c) claims is what makes a particular crime a "crime of violence." Under § 924(c)(3), "the term 'crime of violence' means" a felony that

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). Part (a) is commonly called the "force" clause, and part (b) is known as the "residual" clause. See United States v. Booker, 644 F.3d 12, 20 (1st Cir. 2011) (discussing §

924(e)). A similar, but not identical, residual clause in § 924(e)(2)(B) was recently found unconstitutionally vague. Johnson v. United States, 135 S. Ct. 2551, 2563 (2015). Taylor claims the § 924(c)(3) residual clause is also vague, and thus unconstitutional, so his ACCA conviction can stand only if one of his other crimes of conviction--robbery under 18 U.S.C. § 2114(a), kidnapping or attempted kidnapping under 18 U.S.C. § 1201(a)(5), or assault under 18 U.S.C. § 111(a)(1) and (b)--is a crime of violence. Taylor, of course, says they are not because none of the charged crimes meet the definition. The government admits that kidnapping cannot hold the weight, but argues that the other two can. Taylor counters that even if assault is a crime of violence, it cannot hold the weight because it was not listed as a predicate in the indictment.

We need not, and so do not, decide whether the § 924(c)(3) residual clause is unconstitutionally vague, or whether Taylor's enhanced robbery conviction under § 2114(a) is a crime of violence, because his aggravated assault conviction under 18 U.S.C. § 111(b) is a crime of violence under the "force" clause, and because Taylor cannot show that any constructive amendment to the indictment was prejudicial.

### The Assault Predicate

Physical force under the ACCA "means violent force-—that is, force capable of causing physical pain or injury to another

- 26 -

person." <u>Johnson</u> v. <u>United States</u>, 559 U.S. 133, 140 (2010). To determine whether a crime requires the use, attempted use, or threatened use of violent force, we apply a categorical approach. That means we consider the elements of the crime of conviction, not the facts of how it was committed, and assess whether violent force is an element of the crime. <u>United States</u> v. <u>Fish</u>, 758 F.3d 1, 5 (1st Cir. 2014). For those not in the know, the "'[e]lements' are the 'constituent parts' of a crime's legal definition--the things the 'prosecution must prove to sustain a conviction.' At a trial, they are what the jury must find beyond a reasonable doubt to convict the defendant." <u>Mathis</u> v. <u>United States</u>, 136 S. Ct. 2243, 2248 (2016) (quoting Black's Law Dictionary 634 (10th ed. 2014)). Some statutes are divisible, meaning they list elements in the alternative. If a statute is divisible, then we apply the modified categorical approach: we consult a limited category of documents known as "Shepard Documents"--including the indictment or information and the jury instructions--to figure out which version of the crime the defendant was charged with committing, then we consider what those elements require. <u>See</u> <u>Fish</u>, 758 F.3d at 6.

Some crimes are defined broadly enough to cover some conduct that meets the force clause definition and some conduct that does not. "For example, in Massachusetts, the broad definition of simple assault and battery encompasses both a devastating

beating and a tap on the shoulder." Fish, 758 F.3d at 5. (A tap on the shoulder, of course, is not capable of causing physical pain or injury and so does not require violent force.) See id.; Johnson, 559 U.S. at 140. Using the element-based analysis, our goal is "to determine whether the conduct criminalized by the statute, including the most innocent conduct," requires the use of violent force. Id. If not, the crime cannot support a conviction under the ACCA. See id.

Subsection (a) of 18 U.S.C. § 111, the assault statute at issue, provides that whoever "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with" current or former federal officers

> shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both.

18 U.S.C. § 111. Subsection (b) provides for enhanced penalties if the perpetrator "uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury." 18 U.S.C. § 111(b).

As between subsections (a) and (b), the statute is plainly divisible: the subsections are set out in the alternative and each carries its own penalties. See Mathis, 136 S. Ct. at 2256.

- 28 -

Subsection (a) is likewise divisible because it sets out elements in the alternative--a defendant can be convicted of "simple assault" under § 111(a) with or without coming into physical contact with the officer or the intent to commit another felony-- and each alternative carries its own penalties. So, we look to the indictment and jury instructions to determine the elements of Taylor's crime of conviction.[5] According to those documents, Taylor did (1) "forcibly" (2) assault, resist, oppose, impede, or interfere with the Postal Letter Carrier, and he (3) used a "deadly and dangerous weapon" in the commission of that assault, or "did inflict bodily injury" on the Postal Letter Carrier.

In assessing whether the enhanced versions of § 111(b) are crimes of violence, we do not write on a clean slate. In fact, every court we are aware of that has considered the issue has found that it is because the elements of the enhanced offense require the use, attempted use, or threatened use of force capable of causing pain or injury. United States v. Rafidi, 829 F.3d 437, 445–46 (6th Cir. 2016); United States v. Hernandez-Hernandez, 817 F.3d 207, 215 (5th Cir. 2016) (decided under Sentencing Guidelines § 2L1.2); United States v. Green, 543 F. App'x 266, 272 (3d Cir.

---

[5] We assume here that subsection (b) is not divisible because we need not decide the question: Taylor's indictment and the jury instructions list in the alternative both parts of subsection (b)- -the use of a deadly or dangerous weapon and the infliction of bodily injury--and as we will explain shortly, both require the use, attempted use, or threatened use of violent force.

- 29 -

2013) (decided under Sentencing Guidelines § 4B1.1); United States v. Juvenile Female, 566 F.3d 943, 948 (9th Cir. 2009) (decided under 18 U.S.C. § 16). These courts' rationale comports with our precedent, and so we agree.

First, the elements of the unenhanced offense. The government must show that the defendant acted "forcibly" under § 111(a). The element of "forcible" action can be met by a showing of either physical contact with the federal agent, or by "such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death." E.g., Rafidi, 829 F.3d at 446 (quoting United States v. Chambers, 195 F.3d 274, 277 (6th Cir. 1999)); United States v. Schrader, 10 F.3d 1345, 1348 (8th Cir. 1993). "Forcibly" modifies all of the actions that follow, including assault. See United States v. Charles, 456 F.3d 249, 255 (1st Cir. 2006). The government must also prove an assault, or a similar act of resisting, opposing, or impeding an officer.[6] Assault is not defined in the statue and so we give the

---

[6] Many courts have determined that an "assault" is a necessary element of any § 111(a) conviction, meaning that even to prove a defendant forcibly intimidated an officer, for example, the prosecution must show an assault occurred. United States v. Wolfname, 835 F.3d 1214, 1219 (10th Cir. 2016) (describing this as the consensus view, collecting cases); but see United States v. Briley, 770 F.3d 267, 274 (4th Cir. 2014) (concluding the opposite), cert. denied, 135 S. Ct. 1844 (2015). We need not address this issue, though--the parties assume that assault is the only relevant crime and they do not address the other actions (even though the jury instructions listed them in the alternative). And

term its common law meaning. See United States v. Bayes, 210 F.3d 64, 68 (1st Cir. 2000); United States v. Frizzi, 491 F.2d 1231, 1231 (1st Cir. 1974). At common law, assault meant "an attempt to commit a battery" or "an act putting another in reasonable apprehension of bodily harm." Bayes, 201 F.3d at 68 (quoting United States v. Bell, 505 F.2d 539, 540 (7th Cir. 1974)). A battery is the "slightest willful offensive touching." Id.

We need not dwell on § 111(a). Battery is the prototypical overbroad crime because it can encompass behavior that is capable of causing physical pain or injury and conduct that is not, such as our shoulder-tapping example from above. See, e.g., Fish, 758 F.3d at 5. Assault, which can be proven by an attempt to commit battery, is likewise overbroad. Our case law confirms that § 111(a) has been applied to this type of offensive yet painless act: for example, we have found that a defendant violated § 111(a) by spitting in a mail carrier's face. Frizzi, 491 F.2d at 1231; see also United States v. Ramirez, 233 F.3d 318, 322 (5th Cir. 2000) (collecting cases), overruled on other ground by United States v. Cotton, 535 U.S. 625, 629 (2002). So, we turn to the enhancement provisions that applied to Taylor's conviction.

The first enhanced version of § 111 is met when the defendant "uses a deadly or dangerous weapon" in assaulting the

_____

either way, the important point is that all of these actions must be done "forcibly" under § 111.

federal officer. A deadly or dangerous weapon is "any object which, as used or attempted to be used, may endanger the life of or inflict great bodily harm on a person." United States v. Sanchez, 914 F.2d 1355, 1358 (9th Cir. 1990). "Not the object's latent capability alone, but that, coupled with the manner of its use, is determinative." United States v. Loman, 551 F.2d 164, 169 (7th Cir. 1977) (quoting United States v. Johnson, 324 F.2d 264, 266 (4th Cir. 1963)). Recall that to be a crime of violence, the crime must require the "use, attempted use, or threatened use" of "force capable of causing physical pain or injury to another person." Johnson, 559 U.S. at 140. A defendant who acts "forcibly" using a deadly or dangerous weapon under § 111(b) must have used force by making physical contact with the federal employee, or at least threatened the employee, with an object that, as used, is capable of causing great bodily harm.

As we recently observed in assessing Massachusetts' Assault with a Dangerous Weapon statute: "the harm threatened by an assault is far more violent than offensive touching when committed with a weapon that is designed to produce or used in a way that is capable of producing serious bodily harm or death. As a result, the element of a dangerous weapon imports the 'violent force' required by Johnson into the otherwise overbroad simple assault statute." United States v. Whindleton, 797 F.3d 105, 114 (1st Cir. 2015), cert. dismissed, 137 S. Ct. 23 (2016), and cert.

- 32 -

denied, 137 S. Ct. 179 (2016); accord United States v. Hudson, 823 F.3d 11, 18 (1st Cir. 2016). The same logic applies here. It is possible to commit simple assault under § 111(a) without using violent force. But, this enhancement necessarily requires the use or threat of force "capable of causing physical pain or injury to another." Johnson, 559 U.S. at 140. Even if simple assault under § 111(a) does not require violent force, this enhanced version does.

The second enhanced version of § 111 is met when the defendant inflicts bodily injury in the course of the forcible assault. If "a slap in the face" counts as violent force under Johnson because it is "capable" of causing pain or injury, 559 U.S. at 143, a "forcible" act that injures does, too, because the defendant "necessarily must have committed an act of force in causing the injury," Juvenile Female, 566 F.3d at 946-48 (holding that assault "resulting in bodily injury" under § 111(b) is a crime of violence); accord Hernandez-Hernandez, 817 F.3d at 216-17. And Taylor makes no argument that it does not.

Attempting to forestall this conclusion, Taylor argues that to qualify as a crime of violence, § 111(b) must require that the use of force be at least reckless. The jury was instructed that the government had to prove Taylor "intended to assault," so we take his argument to mean that Taylor thinks a defendant could be convicted of intentionally and forcibly assaulting, yet

- 33 -

accidentally using a dangerous weapon or injuring, a federal employee. But Taylor cites no authority to support this argument, and we have found none.[7] He must give us some reason to believe the statute might apply in the manner he claims because "we need not consider fanciful, hypothetical scenarios" in determining whether a crime is a crime of violence. Fish, 758 F.3d at 6.

**The Constructive Amendment**

Finally, even if § 111(b) is a crime of violence, Taylor says for the first time on appeal that the assault cannot support his conviction under § 924(c) because assault was not listed as a predicate crime in the indictment. Taylor was charged with using a firearm during and in relation to a crime of violence, "to wit" robbery and attempted robbery, kidnapping, and attempted kidnapping. But, the jury was instructed that it could also convict Taylor under § 924(c) if he used a firearm during and in relation to the assault under § 111(b). According to Taylor, this

---

[7] To the contrary, although the case law on this point is sparse in this circuit, the only authorities we have found indicate that the crime and the enhancements require an intentional act, not merely a reckless or accidental one. See United States v. Feola, 420 U.S. 671, 686 (1975) (§ 111 requires "the criminal intent to do the acts therein specified"); United States v. Acosta-Sierra, 690 F.3d 1111, 1123 (9th Cir. 2012) (under § 111, defendant must have acted "knowingly and intentionally and forcibly"); United States v. Arrington, 309 F.3d 40, 44 (D.C. Cir. 2002) (weapon must be used intentionally under § 111(b)); cf. Popal v. Gonzales, 416 F.3d 249, 254 n.5 (3d Cir. 2005) (distinguishing assault under § 111, which requires willfulness, from Pennsylvania simple assault, which can be accomplished recklessly).

discrepancy is a constructive amendment, so a § 924(c) conviction predicated on the assault conviction cannot stand.

"[A] constructive amendment occurs when the charging terms of an indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them." United States v. McIvery, 806 F.3d 645, 652 (1st Cir. 2015) (quoting United States v. Brandao, 539 F.3d 44, 57 (1st Cir. 2008)), cert. denied, 137 S. Ct. 44 (2016). The indictment did not include assault in the list of predicate crimes, but the jury instructions did. This literal alteration of the charging terms is a constructive amendment. But, that is as far as Taylor's argument takes him. We consider Taylor's constructive amendment claim forfeited. See United States v. Olano, 507 U.S. 725, 733-34 (1993). That means we review for plain error, but Taylor has not shown the constructive amendment affected his substantial rights. See United States v. Vizcarrondo-Casanova, 763 F.3d 89, 99-100 (1st Cir. 2014), cert. denied, 135 S. Ct. 307 (2014), and cert. denied sub nom. Aponte-Sobrado v. United States, 136 S. Ct. 260 (2015), and cert. denied sub nom. Díaz-Colón v. United States, 136 S. Ct. 30 (2015); Brandao, 539 F.3d at 60.

The rule against constructive amendments exists "to preserve the defendant's Fifth Amendment right to indictment by grand jury, to prevent re-prosecution for the same offense in violation of the Sixth Amendment, and to protect the defendant's

Sixth Amendment right to be informed of the charges against him." Vizcarrondo-Casanova, 763 F.3d at 99 (quoting Brandao, 539 F.3d at 57). Taylor argues the prejudice here is to his Fifth Amendment right to indictment by grand jury because the trial jury could have found he used the gun exclusively in conjunction with the assault, not the robbery or the kidnapping, thus he is entitled to reversal.

To support that claim, Taylor relies on Stirone v. United States, 361 U.S. 212 (1960). But Stirone does not help Taylor. In Stirone, the defendant was indicted on a charge of interfering with Pennsylvania's inbound sand trade, but the government presented evidence that he also interfered with the state's outbound steel trade, and the trial court permitted the jury to convict on either basis. 361 U.S. at 217. Because of the constructive amendment, the Court reversed the defendant's conviction. Id. at 219. In United States v. Brandao, 539 F.3d at 60, we confronted the question of whether or not constructive amendments are prejudicial per se and determined they are not, distinguishing Stirone over the defendant's objection that the case compelled a contrary conclusion. As we explained in Brandao, the error in Stirone was preserved--meaning unlike here, the defendant objected at trial--so plain error review did not apply. 539 F.3d at 61. And, as we also explained in Brandao, the error in Stirone was prejudicial because it permitted the jury to convict

based on the outbound interference claim, "an act <u>not alleged at all</u> in the indictment." 539 F.3d at 62 (emphasis added and citation omitted). So, the <u>Stirone</u> error prejudiced both the defendant's Fifth Amendment right to indictment by grand jury and his Sixth Amendment right to be informed of the charges against him. <u>See</u> <u>id.</u>

Here, Taylor did not object at trial, so under <u>Brandao</u>, 539 F.3d at 60, plain error review applies. And a look at the indictment might explain why Taylor did not object: the grand jury indicted Taylor for using a firearm during the assault. So, even though the assault was not listed as a predicate to the § 924(c) charge of using a firearm during a crime of violence, the grand jury found that Taylor did use a firearm during the assault. Under the circumstances, Taylor cannot show this prejudiced his defense.[8]

Because the enhanced assault conviction under § 111(b) is a crime of violence under the force clause of § 924(c)(3), and because Taylor was not prejudiced by any constructive amendment, his conviction under § 924(c) is affirmed.

---

[8] In his reply brief, Taylor also relies on <u>United States</u> v. <u>Randall</u>, 171 F.3d 195 (4th Cir. 1999), where the Fourth Circuit reversed a conviction because the defendant was indicted for using a firearm while distributing drugs, but the jury instructions permitted conviction for using a firearm in connection with possession with intent to distribute. This case is distinguishable from Taylor's situation because the possession charge that served as the basis for Randall's conviction was not listed in the indictment. In any case, in <u>Randall</u> the Fourth Circuit did not apply plain error review.

## The Sentence

In his final claim on appeal, Taylor challenges the procedural reasonableness of his sentence.[9] Over two objections, which we address in turn, Taylor was sentenced to about thirty years in prison. His sentence includes a downward variance, but from a Guidelines range that Taylor argues was erroneously adopted by the trial court. On this argument, Taylor gains some traction at last. As we describe below, Taylor challenges his sentence on a ground not raised to the district court, so Taylor bears the burden of showing plain error, see United States v. Marchena-Silvestre, 802 F.3d 196, 200 (1st Cir. 2015), which as we have noted is a not-so-defendant-friendly standard, see United States v. Williams, 717 F.3d 35, 42 (1st Cir. 2013).

Taylor objected to his Guidelines sentencing range below, claiming his prior conviction for larceny from the person is not a crime of violence under the categorical approach mandated by Fish, 758 F.3d at 5, and the Presentence Investigation Report erroneously categorized it as such by considering the facts of the offense rather than the elements of the crime. The trial court judge rejected this argument, finding she was bound by this Court's holdings to find that larceny from the person was a crime of

---

[9] Although a heading in Taylor's brief describes his sentence as procedurally and substantively unreasonable, he does not develop any substantive reasonableness argument at all, so it is waived. Oladosu, 744 F.3d at 39.

violence under the Guidelines' career offender residual clause. As a result, Taylor was sentenced as a career offender with a base offense level of 37 and a total criminal history score of 13. By the sentencing math, his Guidelines range was 360 months to life in prison. Had larceny from the person not been counted as a crime of violence, Taylor's base offense level would have been 34 (not 37), and he would have had 12 (not 13) criminal history points. The resulting Guidelines range would have been 235 to 293 months.

Taylor also argued below that a downward departure was warranted because his criminal history category overstated the seriousness of his past crimes and the likelihood that he would commit other crimes in the future. For instance, Taylor noted that two of his criminal history points were for minor offenses committed when he was very young: he accrued one point for disorderly conduct because he was caught carrying a BB gun when he was sixteen; he accrued another point for receiving a stolen motor vehicle when he was seventeen, though he claimed he was using a friend's vehicle at the time so it was "essentially a Use Without Authority case." Taylor also pointed out that he was prosecuted as an adult for four offenses committed when he was seventeen, but Massachusetts law has since changed--under today's law those crimes would be juvenile offenses and likely subject to a diversionary program in lieu of incarceration. Taylor received a total of six points for those offenses.

Taylor found a more receptive audience on this front: the trial judge agreed that Taylor's criminal history was overstated, estimated that if the offenses he committed at age seventeen were treated as juvenile offenses he would have 11 criminal history points instead of 13, and found Taylor would not be a career offender because only adult felony convictions are predicates for career offender status, so his offense level would be 34. By this hypothetical "straight non-career offender scoring," the trial court judge estimated Taylor's Guidelines range would be 235 to 293 months.

In the end, the trial court judge refused to adopt a lower Guidelines range. Nevertheless, she varied from the calculated range of 360 months to life and instead sentenced Taylor to 235 months, plus 120 months for his conviction under § 924(c). Before the sentencing wrapped up, the trial court judge was asked by the prosecutor whether she would have imposed the same sentence whether or not Taylor was considered a "career offender." She agreed that she would.

On appeal, Taylor now argues that his Guidelines range was wrong because Massachusetts' crime of larceny from the person is a crime of violence only under the now-unconstitutional residual clause. The government concedes the point, and agrees that counting the larceny conviction as a crime of violence was a "clear or obvious" error. See Marchena-Silvestre, 802 F.3d at 200. To be

entitled to relief on plain error review, then, Taylor must show that the error impacted his substantial rights, and that it seriously affected the "fairness, integrity, or public reputation" of the judicial proceedings. Id. (citation omitted). According to the government, it did neither because the record makes clear that Taylor's sentence was not imposed as a result of the error. We disagree.

An error affects the defendant's substantial rights if it is prejudicial, and in the sentencing context prejudice means there is "a reasonable likelihood 'that, but for the error, the district court would have imposed a different, more favorable sentence.'" Marchena-Silvestre, 802 F.3d at 200 (quoting United States v. Ortiz, 741 F.3d 288, 293-94 (1st Cir. 2014)). "In most cases a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome." Molina-Martinez v. United States, 136 S. Ct. 1338, 1346 (2016). This is so because the Guidelines range provides the trial court with "a framework or starting point to guide the exercise of the court's discretion." Marchena-Silvestre, 802 F.3d at 201 (quoting United States v. Millán-Isaac, 749 F.3d 57, 66-67 (1st Cir. 2014)) (internal citations and quotation marks omitted). If the starting point is moved forward because of error, it is reasonable to assume that the end point will also be further down the track than it

would have been if not for the error. Id. This means that where the starting point is wrong, the defendant has shown a "reasonable probability of a different outcome," even if the sentence imposed is within the correct Guidelines range that would be applied on remand. Molina-Martinez, 136 S. Ct. at 1345; see United States v. Hudson, 823 F.3d 11, 19 (1st Cir. 2016).

The government can counter by pointing to "'a clear statement by the [sentencing] court' that would be sufficient to 'diminish the potential of the [Guideline Sentencing Range] to influence the sentence actually imposed.'" Hudson, 823 F.3d at 19 (quoting Marchena-Silvestre, 802 F.3d at 201). "A sentencing court might, for example, make it clear that it was aware of a possible flaw in its calculation of a guideline sentencing range, and explain that its sentence would nevertheless be the same under an alternative analysis pressed by the party that ultimately appealed." Marchena-Silvestre, 802 F.3d at 201. In those circumstances, we typically look for an indication that the trial court "intended to untether" the sentence from the Guidelines range. Hudson, 823 F.3d at 19. For instance, in United States v. Tavares, 705 F.3d 4, 27 (1st Cir. 2013), the parties disputed whether Tavares' criminal history category was five or six, and the district court clearly erred in failing to choose. But, believing either potentially-applicable range too lenient, the trial court threw the Guidelines out the window and imposed the

statutory maximum sentence. Under these circumstances we found the error was harmless because the sentencing Guidelines did "not matter" or impact the sentence imposed. Id. at 25; see also United States v. Romero-Galindez, 782 F.3d 63, 70 (1st Cir. 2015) (Guidelines irrelevant where trial court gave a higher statutory sentence). But absent a clear statement in the record showing the Guidelines error did not influence the sentence imposed, a Guidelines error is a prejudicial error. See Hudson, 823 F.3d at 19-20; United States v. McGhee, 651 F.3d 153, 159 (1st Cir. 2011) (remanding for resentencing even though defendant was sentenced below the Guidelines range where the transcript did not show "that the career offender designation was entirely irrelevant").

Taylor's starting point was wrong:  the trial court judge adopted the Guidelines range set out in the Presentence Investigation Report, which counted Taylor's larceny from the person conviction as a crime of violence. "In most cases" that would be enough to show "a reasonable probability of a different outcome." Molina-Martinez, 136 S. Ct. at 1346. The government contends this is not "most cases" because the trial court judge made a clear statement showing she based Taylor's sentence on factors independent of the Guidelines:  she said she would have imposed the same sentence regardless of Taylor's "career offender" status, a fact she believed implicit in her statement of reasons.

We do not agree that this statement was clear enough to show the erroneously calculated Guidelines range did not influence the sentence ultimately imposed. It is true that the trial court judge estimated a "straight non-career offender scoring" in her statement of reasons that excluded Taylor's juvenile larceny conviction as a career offender predicate, thereby reducing his offense level. But the Guidelines sentencing range is a product of the offense level and the criminal history score. The court's explanation only accounts for the inflated offense level, but the criminal history score was also inflated from category V to category VI because of the extra point that resulted from the erroneous consideration of Taylor's larceny from the person conviction as a crime of violence. And the judge's statement of reasons does not explain away the potential impact of the inflated criminal history score. To the contrary, it shows the judge considered Taylor's erroneously-calculated criminal history score, determined it was overstated because Taylor was prosecuted as an adult for crimes he committed at age seventeen, and varied downward from the starting point. Indeed, she knocked off enough points to bump Taylor down into a lower criminal history category--from criminal history category VI to criminal history category V. Of course, if Taylor's criminal history score were correctly calculated he would not have received an additional point for the larceny conviction being a crime of violence, and he would have

been in a lower criminal history category to begin with; considering the correct score, the judge may have varied lower still. On this record we cannot know because the judge's reasons had nothing to do with the source of the error that Taylor alleges now--the improper inclusion of the larceny conviction as a crime of violence.

In any case, the statement of reasons does not show that the Guidelines were irrelevant, or that the trial court judge intended to untether Taylor's sentence from the Guidelines range. The statement only shows the trial court judge started from the wrong starting point, then varied downward from that starting point for a reason unrelated to the error that made the starting point wrong to begin with. The fact that she varied downward for an unrelated reason does not eliminate the potential influence of the incorrectly calculated Guidelines range, even though the sentence she imposed is within the correct range. "Even if the sentencing judge sees a reason to vary from the Guidelines, 'if the judge uses the sentencing range as the beginning point to explain the decision to deviate from it, then the Guidelines are in a real sense the basis for the sentence.'" Molina-Martinez, 136 S. Ct. at 1345 (quoting Peugh v. United States, 133 S. Ct. 2072, 2083 (2013)). On this record, it is not clear to us that the Guidelines range did not influence the sentence the trial court judge ultimately imposed. Taylor has therefore shown that the improperly

calculated Guidelines range was prejudicial, and so had an impact on his substantial rights. See id. at 1347.

That leaves only the question of whether the error seriously affected the "fairness, integrity, or public reputation" of the judicial proceedings. Marchena-Silvestre, 802 F.3d at 200. We believe that the district court's application of an erroneously-inflated Guidelines range, and the possibility that Taylor's sentence was inflated as a result, compromised the fairness and integrity of his sentencing. Accord id.; United States v. Torres-Rosario, 658 F.3d 110, 117 (1st Cir. 2011) (remanding for resentencing to avoid a "miscarriage of justice" where error resulted in "difference in potential jail time"); cf. Hudson, 823 F.3d at 20 (where Guidelines range was wrong, remanding for resentencing without addressing fourth prong of plain error). We therefore exercise our discretion to correct this error and vacate the sentence. See Marchena-Silvestre, 802 F.3d at 202.

We recognize that Taylor's sentence on remand may be unchanged, but as we explained in United States v. Hernandez Coplin, 24 F.3d 312, 320 (1st Cir. 1994),

> [r]esentencing in this instance requires no additional evidence and is only a small administrative burden. Even small adjustments could make a lot of difference to the defendant. Above all, the great latitude possessed by the district court in deciding how far to depart makes it all the more important that the district judge exercise a fully informed discretion.

We thus remand to permit the trial court judge to conduct a new sentencing hearing wherein she may, with the benefit of our thinking, exercise her "fully informed discretion." Id.

**The End**

We affirm Taylor's conviction, but remand this case to the district court for reconsideration of Taylor's sentence.