# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

JUVENILE FEMALE,
          *Defendant-Appellant.*

No. 07-50549

D.C. No.
CR-07-02437-IEG

OPINION

Appeal from the United States District Court
for the Southern District of California
Irma E. Gonzalez, District Judge Presiding

Argued and Submitted
December 10, 2008—Pasadena, California

Filed May 27, 2009

Before: Harry Pregerson, Dorothy W. Nelson and
David R. Thompson, Circuit Judges.

Opinion by Judge Nelson

---

## COUNSEL

Todd W. Burns, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant-appellant.

Goerge D. Hardy, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

---

## OPINION

D.W. NELSON, Senior Circuit Judge:

In 2007, Juvenile Female was found guilty of Juvenile Delinquency based on her violation of 18 U.S.C. § 111 (Assault on a Federal Officer). She now appeals the denial of her motion to dismiss for lack of jurisdiction, as well as the denial of her motion for a judgment of acquittal. We affirm both of the District Court's orders.

### FACTUAL AND PROCEDURAL BACKGROUND

On September 4, 2007, Border Patrol Agent Anthony Ponzio, who was stationed about a quarter of a mile away from the United States-Mexico border, heard a radio dispatch that a suspicious vehicle had been spotted. A few minutes later, he

saw a white Chevrolet Impala idling on the side of the road. After finding that the license plate was registered to a rental car company that was frequently involved in illicit activities, Ponzio drove up to the Impala and asked the driver if he was lost. Juvenile Female ("JF") was sitting in the passenger seat of the car.

Supervisory Border Patrol Agent Leo Miele ordered Ponzio to "clear the area" because he thought the Impala might be in the area to pick up narcotics. Miele then waited in a driveway about two-and-a-half miles down the road. After the Impala passed Miele's vehicle, he pulled up behind it. The driver pulled off to the side of the road and signaled for Miele to pass. Agent Miele indicated that the Impala ought to keep on driving. About three-and-a-half miles later, the Impala pulled over once more and signaled again for Miele to pass. At this point, Miele pulled up next to the car and identified himself as a Border Patrol agent. In doing so, he recognized the driver as someone he had arrested, in December 2005, for transporting about 500 pounds of marijuana in a disguised pick-up truck. The driver agreed to speak to Miele. Miele indicated a driveway where the car could pull over. The Impala did not stop, however, and Miele followed in pursuit.

Miele radioed other agents, including Border Patrol Agent Alexander Djokich, and notified them that he was following a suspected drug smuggler. The Impala eventually stopped and the driver fled, leaving the driver's side open. Miele chased the driver.

The first agent to reach the Impala was Djokich. He noticed JF moving inside the vehicle, and ran to the open door with his gun drawn. JF was climbing across the front seat. Djokich identified himself, and ordered her to exit the car. JF, however, was screaming and kicking towards him. A scuffle ensued, during which JF stabbed Djokich in the back of his left leg with a small knife.

On September 5, 2007, the United States Attorney for the Southern District of California ("the Government") filed an Information charging JF with Juvenile Delinquency, in violation of 18 U.S.C. §§ 111(a), 111(b), and 5032. The Information stated, in relevant part, that JF:

> did knowingly and intentionally and forcibly assault, resist, oppose, impede and interfere with a person named in Title 18, United States Code, Section 1114, namely, United States Border Patrol Agent A. Djokich, in that defendant in an attempt to resist apprehension, kicked Agent A. Djokich and stabbed agent A. Djokich with a knife, a deadly and dangerous weapon, while Agent A. Djokich was engaged in the performance of his official duties; in violation of Title 18, U.S.C., Section 5032 and Title 18, U.S.C., Section 111(a) and (b).

The Government also filed a certification, pursuant to 18 U.S.C. § 5032(3), stating that "the offense charged . . . is a crime of violence that is a felony and that there is a substantial Federal interest in the case to warrant the exercise of Federal jurisdiction." On September 19, 2007, JF filed a motion to dismiss for lack of jurisdiction, arguing that 18 U.S.C. § 111 was not categorically a crime of violence. The District Court denied the motion.

The case then proceeded to trial. JF moved for a judgment of acquittal after submission of the Government's case, and again at the close of evidence, arguing that Agent Djokich was not engaged in an "official duty," one of the elements of the offense. The District Court denied both motions. The court subsequently found that JF had committed an act of Juvenile Delinquency, and sentenced her to three years' probation. JF then timely appealed to this court.

### STANDARD OF REVIEW

"We generally review de novo a district court's assumption of jurisdiction." *United States v. Juvenile Male*, 118 F.3d

1344, 1346 (9th Cir. 1997). "Whether or not . . . [an underlying offense] is a crime of violence is a question of statutory interpretation reviewed de novo." *Id.* at 1350. A district court's ruling on a motion for a judgment of acquittal is also reviewed de novo. *United States v. McNeil*, 320 F.3d 1034, 1035 (9th Cir. 2003).

## *DISCUSSION*

The government charged JF with violations of 18 U.S.C. § 111(a) and 111(b). When JF was charged, 18 U.S.C. § 111 provided as follows:[1]

> (A)In general.—Whoever . . . forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties . . . shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and in all other cases, be fined under this title or imprisoned not more than 8 years, or both.

> (b) Enhanced penalty.—Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

---

[1]Congress recently amended § 111(a) as a part of the Court Security Improvement Act of 2007, replacing "in all other cases" with "where such acts involve physical contact with the victim of that assault or the intent to commit another felony." Pub. L. No. 110-177, 121 Stat. 2538 (2007).

## I.   JURISDICTION OVER JUVENILE FEMALE

> A juvenile alleged to have committed an act of juvenile delinquency . . . shall not be proceeded against in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that . . . the offense charged is a crime of violence that is a felony . . . , and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction.

18 U.S.C. § 5032.

"Certification is a jurisdictional requirement." *United States v. Juvenile Male (Kenneth C.)*, 241 F.3d 684, 686 (9th Cir. 2001) (internal quotation marks omitted). JF argues that a violation of 18 U.S.C. § 111 is not a crime of violence, and that the District Court erred in assuming jurisdiction over her.

### A.

[1] When exercising jurisdiction over a juvenile, this Court follows what has been termed a "categorical approach" to determine whether an offense is a crime of violence. *See Leocal v. Ashcroft*, 543 U.S. 1, 8 (2004) (using a categorical approach to determine whether a crime was a crime of violence warranting deportation); *United States v. David H.*, 29 F.3d 489, 494 (9th Cir. 1994); *United States v. Baker*, 10 F.3d 1374, 1393-94 (9th Cir. 1993), *overruled on other grounds by United States v. Norby*, 225 F.3d 1053 (9th Cir. 2000).

[2] Under the categorical approach, "the generic, rather than the particular, nature of the predicate offense is determinative in defining a crime of violence." *Baker*, 10 F.3d at 1394 (internal quotations omitted). A crime "qualifies as a crime of violence . . . if and only if the full range of conduct covered by it falls within the meaning of that term." *Valencia*

*v. Gonzales*, 439 F.3d 1046, 1049 (9th Cir. 2006) (internal quotation marks omitted).

**[3]** We recently held that 18 U.S.C. § 111 sets out three separate crimes. *United States v. Chapman*, 528 F.3d 1215, 1218 (9th Cir. 2008) ("[S]everal of our sister circuits have held that § 111 creates three distinct offenses, one misdemeanor and two felonies. We agree that this formulation of the statute is required.") (internal citations omitted).

**[4]** Unfortunately, "[t]he statute itself offers little guidance on the precise contours of the three separate offenses created by § 111." *United States v. Hathaway*, 318 F.3d 1001, 1007 (10th Cir. 2003); *see also Chapman*, 528 F.3d at 1218 ("Section 111(a) is inartfully drafted."). In *Chapman*, we held that "[v]iolations of the 'simple assault' provision constitute misdemeanors. Violations of the 'all other cases' or dangerous weapon or bodily harm provisions constitute felonies." 528 F.3d at 1218 (internal citation omitted).

In differentiating between the two offenses described in section 111(a), "simple assaults" and "all other cases," some of our sister circuits require physical contact, whereas others require physical contact *or* a similar aggravating factor, such as the intent to commit a murder or a serious felony.[2] *Id.* at 1219. In *Chapman*, we declined to adopt a rule, and held that under either approach, "while a defendant could be charged with resisting, opposing, impeding, intimidating, or interfering, he could not be convicted unless his conduct *also amounted to an assault*." *Id.* (emphasis added).

**[5]** The third offense, which is the one at issue in this case, was not specifically addressed in *Chapman*. *Id.* Our sister circuits, however, have held that section 111(b) describes an "assault involving a deadly or dangerous weapon or resulting in

---

[2]In light of the 2007 revision, this issue is moot and limited solely to defendants who were charged under the prior version of the statute.

bodily injury." *United States v. Vallery*, 437 F.3d 626, 630 (7th Cir. 2006); *see also United States v. Gagnon*, 553 F.3d 1021, 1024 (6th Cir. 2009); *Hathaway*, 318 F.3d at 1007-09; *United States v. Yates*, 304 F.3d 818, 821 (8th Cir. 2002); *United States v. McCulligan*, 256 F.3d 97, 102 (3d Cir. 2001); *United States v. Chestaro*, 197 F.3d 600, 607-08 (2d Cir. 1999); *United States v. Nunez*, 180 F.3d 227, 233 (5th Cir. 1999). In light of these cases, the plain language of the statute, and our determination that "convictions under this statute require at least some form of assault," *Chapman*, 528 F.3d at 1221, JF's argument that the third offense subsumes five other non-assaultive offenses, because it also lists those who resist, oppose, impede, intimidate, or interfere with designated officers, fails.

JF also argues that regardless of whether § 111 lays out three separate offenses, under the categorical approach, the panel must consider the entire range of conduct criminalized by the statute. This is unpersuasive. The categorical approach does not focus on a criminal statute in its entirety, but on the offense or crime. *See, e.g.*, *Leocal*, 543 U.S. at 7 (The Court "look[s] to the elements and the nature of the *offense* of conviction.") (emphasis added); *United States v. Gomez-Leon*, 545 F.3d 777, 783 (9th Cir. 2008) (considering only subsection (c)(3) of Cal. Pen. Code § 192); *Baker*, 10 F.3d at 1394 ("[T]he generic, rather than the particular, nature of the predicate *offense* is determinative.") (emphasis added).

## B.

The appropriate question before us, therefore, is whether an "assault involving a deadly or dangerous weapon or resulting in bodily injury," under 18 U.S.C. § 111, is, categorically, a crime of violence. We hold that it is.

**[6]** Under 18 U.S.C. § 16, a crime of violence is defined as

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

"In construing both parts of § 16, we cannot forget that we ultimately are determining the meaning of the term 'crime of violence.' The ordinary meaning of this term, combined with § 16's emphasis on the use of physical force against another person . . . suggests a category of violent, active crimes." *Leocal*, 543 U.S. at 11.

There are two variants of this offense: (1) assault involving a deadly or dangerous weapon, and (2) assault resulting in bodily injury. "To constitute an assault, an action must be either a willful attempt to inflict injury upon the person of another, or . . . a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm." *Chapman*, 528 F.3d at 1219-20 (internal quotation marks omitted). This court also requires intent to assault. *United States v. Spears*, 631 F.2d 114, 117 n.5 (9th Cir. 1980). A deadly or dangerous weapon is "any object which, as used or attempted to be used, may endanger the life of or inflict great bodily harm on a person." *United States v. Sanchez*, 914 F.2d 1355, 1358 (9th Cir. 1990) (internal quotation marks omitted).

**[7]** A defendant charged with the first variant, assault with a deadly or a dangerous weapon, must have always "threatened [the] use of physical force," 18 U.S.C. § 16(a), because he or she will have either made a "wilful attempt to inflict injury" or a "threat to inflict injury," *Chapman*, 528 F.3d at 1219-20 (internal quotation omitted), with an object that "may endanger the life of or inflict great bodily harm on a person,"

*Sanchez*, 914 F.2d at 1358. Similarly, a defendant charged under the second variant, assault resulting in bodily injury, necessarily must have committed an act of force in causing the injury. Thus, both variants are "crimes of violence" pursuant to 18 U.S.C. § 16(a).

Moreover, because the offense is a felony, section 16(b) also applies. *See Chapman*, 528 F.3d at 1218. Section 16(b) sweeps more broadly than section 16(a) because it encompasses offenses where a person merely disregards a *risk* that physical force will be used in commission of the offense. *Leocal*, 543 U.S. at 10-11. For the same reasons described above, the two variants on this crime will always involve a substantial risk that physical force against the person may be used, even if physical force is not an element of the offense.

**[8]** Thus, because JF was charged with a crime of violence, the District Court did not err in assuming jurisdiction over her.

## II. A BORDER PATROL AGENT'S STATUTORY AUTHORITY

To be guilty of juvenile delinquency, JF must have assaulted or resisted a federal officer who was "engaged in . . . the performance of official duties." *See* 18 U.S.C. § 111(a). JF argues that Djokich was not engaged in the performance of official duties because a Border Patrol agent exceeds the scope of his statutory grant of authority when he investigates a drug trafficking crime.

As federal officers, Border Patrol agents are limited to their statutory powers. *Ortiz v. U.S. Border Patrol*, 39 F. Supp. 2d 1321, 1326 (D.N.M. 1999) ("Border Patrol agents are not general law enforcement officers. Instead, . . . their authority and duties are circumscribed by statute and limited in scope."); *see also United States v. Santa Maria*, 15 F.3d 879 (9th Cir. 1994); *cf. United States v. Diamond*, 471 F.2d 771,

773 (9th Cir. 1973) ("[C]ustoms agents are not general guardians of the public peace, as are state or local police. Their powers . . . to search and arrest persons are limited by statute."). "To hold otherwise would grant Border Patrol agents unfettered discretion to investigate suspected violations of *any and all* cognizable criminal laws . . . ; it would, in effect, give to the Border Patrol the general police power that the Constitution reserves to the States." *United States v. Perkins*, 166 F. Supp. 2d 1116, 1126 (W.D. Tex. 2001).

Although the parties do not dispute that Djokich stopped and attempted to arrest JF because of suspected drug activity, they do dispute the precise contours of the statutory grant of power to the Border Patrol.

Pursuant to 8 U.S.C. § 1357(a)(5)(B), a Border Patrol agent may make a warrantless arrest

> for any felony cognizable under the laws of the United States . . . if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

**[9]** If Djokich was limited to the powers enumerated in § 1357, the warrantless arrest of JF would be beyond the scope of his authority because he was not performing immigration duties at the time. *See id.*; *see also Santa Maria*, 15 F.3d at 883 ("We conclude that § 1357(a)(3) does not authorize the Border Patrol to search only for drugs. The Border Patrol is empowered by § 1357(a)(3) to conduct administrative searches for aliens."). In order to resolve the issue in this case, however, it is necessary to determine what statutory powers have been granted to the Border Patrol in the wake of the dissolution of the Immigration and Naturalization Service ("INS"), and the creation of the Department of Homeland Security ("DHS").

The DHS was created in 2003 by the Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, 116 Stat. 2135 (2003). Pursuant to the HSA, the DHS is an executive department whose mission is, among other things, to (1) "carry out all functions of entities transferred to the Department," and (2) "monitor connections between illegal drug trafficking and terrorism . . . and otherwise contribute to efforts to interdict illegal drug trafficking." 6 U.S.C. § 111(b)(1)(D) & (H).

**[10]** The Border Patrol program was transferred from the INS to the Directorate for Border and Transportation Security ("DPTS"), a subset of the DHS, *id.* § 251, which was also tasked with securing the border and administering the customs laws, *id.* § 202. The Customs Service (a subsection of DPTS) was subsequently renamed the Bureau of Customs and Border Protection ("CBP") and was to "contain the resources and missions relating to borders and ports of entry of the Customs Service, [and] the INS, including the Border Patrol and the inspections program." *Id.* § 542 note (incorporating President Bush's Reorganization Plan, H.R. Doc. No. 108-32).

The Government argues that, as a result, Border Patrol agents are also empowered to "stop, search, and examine . . . any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise . . . introduced into the United States in any manner contrary to law." 19 U.S.C. § 482 (delegation of authority to the customs administration). We agree.

It is true that there are no statutes or federal regulations that specifically empower Border Patrol agents to enforce customs laws.[3] The agencies, however, were combined into the same department, and the purpose of the DHS was to create a "sin-

---

[3]In fact, every relevant mention of the Border Patrol in the Code of Federal Regulations continues to appear solely under the Immigration Regulations. *See, e.g.*, 8 C.F.R. §§ 100.2, 100.4, 103.1, 235.1, 239.1, 274.2, 287.1, 287.4, 287.5, 287.7, 287.8, 1235.1.

gle, unified structure, noting that today numerous Federal entities across the government are charged with responsibilities having to do with homeland security." *See* H.R. Rep. 107-609(I), at 66 (2002), *reprinted in* 2002 U.S.C.C.A.N. 1352, 1356. "Different priorities and divergent policies coupled with various leadership structures, has led to inconsistent inspections and lapses of information. The Department of Homeland Security was established to unite the incoming agencies in the mission of protecting the homeland." Department of Homeland Security, Border Reorganization Fact Sheet (2003), *available at* http:// www.dhs. gov/xnews/releases/press_release_0073.shtm.

**[11]** In light of the purpose and language of the HSA, we conclude that Border Patrol agents, acting within the other statutory limits on their powers, also have the authority, under 19 U.S.C. § 482, to "stop, search, and examine . . . any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise . . . introduced into the United States in any manner contrary to law."

**[12]** Although we have never expressly articulated a rule, for purposes of 18 U.S.C. § 111, "[t]he test of a Government agent's conduct is whether he is acting within the scope of what he is employed to do, as distinguished from engaging in a personal frolic of his own." *United States v. Lopez*, 710 F.2d 1071, 1074 (5th Cir. 1983) (internal quotation marks omitted); *United States v. Cho Po Sun*, 409 F.2d 489, 491 (2d Cir. 1969); *cf. Amaya v. United States*, 247 F.2d 947, 951 (9th Cir. 1957) (holding that an immigration officer who questioned the patrons of a bar regarding their place of birth "was clearly within the scope of his duty in inquiring"). Because Djokich was "within the scope of what he is employed to do" when he stopped and arrested JF, the District Court correctly denied the motion for a judgment of acquittal.

## CONCLUSION

Because the District Court did not err in assuming jurisdiction over Juvenile Female, or in denying the motion for a

judgment of aqcuittal, we AFFIRM the District Court's orders.

**AFFIRMED**.