[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 18-12533

————————————————

D.C. Docket No. 1:13-cr-00501-ELR-JFK-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TITUS BATES,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia

————————————————

(May 28, 2020)

Before  BRANCH  and MARCUS, Circuit  Judges,  and  HUCK,* District Judge.

———————

* Honorable Paul C. Huck, Senior United States District Judge for the Southern District of Florida, sitting by designation.

HUCK, District Judge:

## BACKGROUND

This appeal arises from Defendant-Appellant Titus Bates's convictions and subsequent sentence for possession with intent to distribute marijuana, assaulting a federal officer, discharging a firearm in relation to a crime of violence, and being a felon in possession of a firearm.  Bates now challenges his convictions and sentence, arguing: 1) the district court erred in determining that 18 U.S.C. § 111(b) constitutes a crime of violence under 18 U.S.C. § 924(c); 2) the district court erred in excluding evidence relevant to his self-defense theory at trial; 3) the district court erred in denying his motion for judgment of acquittal on the § 111 and § 924(c) counts; 4) his 360-month sentence is erroneous for various reasons; and 5) the Supreme Court's recent decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), necessitates vacating his guilty plea to being a felon in possession of a firearm.  For the reasons discussed below, we find no error and, therefore, affirm Bates's convictions and sentence.

In the early morning hours of November 21, 2013, a task force of federal and state officers executed a warrant for Bates's arrest and a search of his residence for drug-related offenses.  The officers approached the side door to Bates's home, announced that they were the police, and commanded that the door be opened.  After no one answered, the officers began to ram the door.  Shortly thereafter, Bates fired

two gunshots through the door, hitting one federal officer in the leg.  Bates then called 9-1-1 and told the operator "the police at my door" and to "please tell 'em don't shoot me."  He also said, "I thought it was somebody trying to come in," and "I hope I ain't shot people."  Bates eventually opened the front door and was taken into custody.

When officers took Bates to a patrol car, Bates told Bureau of Alcohol Tobacco and Firearms ("ATF") Agent Kimberly Underwood that he did not know the police were at his door and that he thought he was being robbed.  After officers put Bates in custody, they searched his residence and found approximately seven pounds of marijuana in the kitchen, two shell casings in the living room, and Bates's firearm in the basement, indicating Bates had dropped it down a vent.

Consequently, Bates was indicted on five counts.  The grand jury charged Bates with assaulting a federal officer with a dangerous weapon in violation of 18 U.S.C. § 111 (Count 1); discharging a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) (Count 2); possessing marijuana with intent to distribute in violation of 21 U.S.C. § 841 (Count 3); discharging a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Count 4); and knowingly possessing a firearm as a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (Count 5).  Bates pled guilty to the two possession counts and proceeded to trial on the remaining counts.

3

Prior to trial, Bates filed a motion to dismiss Count 2, on the basis that § 111 did not qualify as a crime of violence for purposes of § 924(c). The district court denied the motion. Bates also gave notice of his intent to rely on psychiatric evidence related to a 2002 shooting incident. Specifically, in 2002, Bates answered a knock at his door and was shot in the mouth and back in an apparent attempted robbery. Bates intended to support his theory of self-defense by introducing psychiatric testimony about the effects of the 2002 shooting on his actions in the instant case, hospital records confirming that he had been shot in 2002, and the statement he made to Agent Underwood. The district court excluded this evidence.

Ultimately, the jury found Bates guilty of assaulting a federal officer under § 111(b) and, because the district court instructed the jury that § 111(b) was a crime of violence, guilty of discharging a firearm in relation to a crime of violence under § 924(c). The jury acquitted Bates of the remaining charge of discharging a firearm in relation to a drug-trafficking crime.

At sentencing, Bates again argued that assault on a federal officer should not be considered a crime of violence. In addition, Bates argued that his prior Georgia convictions for possession of marijuana with intent to distribute were not predicates for "career offender" status under § 4B1.1 of the United States Sentencing Guidelines (the "Guidelines"), and "armed career criminal" status under the Armed Career Criminal Act (the "ACCA"), 18 U.S.C. § 924(e). The district court rejected

4

these arguments.  The district court also denied Bates a two-level reduction for acceptance of responsibility, finding that his guilty pleas were a "strategic move" and not an acceptance of responsibility.  The district court sentenced Bates to thirty years in prison, which he is now serving.

Bates appeals.

## DISCUSSION

### I.  Crime of Violence Determination

First, Bates argues the district court erred by determining that his assault conviction under 18 U.S.C. § 111 qualifies as a "crime of violence" under 18 U.S.C. § 924(c).[1]  The government responds that § 111 contains three separate crimes and, at the very least, the sub-part under which Bates was convicted, § 111(b), qualifies as a crime of violence.  The government is correct.  For the reasons discussed below, we join five sister circuits and hold that a violation of § 111(b) qualifies as a crime of violence.

A district court's designation of an offense as a crime of violence is a question of law subject to *de novo* review.  *See United States v. McGuire*, 706 F.3d 1333, 1336 (11th Cir. 2013).  To qualify as a crime of violence, an offense must meet the

---

[1] Bates also challenges the district court's determination that his conviction under § 111 qualifies as a crime of violence under the Guidelines.  The parties acknowledge that the Guidelines contain an elements clause nearly identical to § 924(c) and, therefore, the same analysis applies.  For the reasons stated herein, § 111(b) also qualifies as a crime of violence under the Guidelines.

definition of § 924(c)'s "elements clause."[2]  The elements clause defines a crime of violence as a felony offense that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  18 U.S.C. § 924(c)(3)(A).  The term "use" means the "active employment" of physical force.  *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004).  The Supreme Court defines "physical force" as "*violent* force – that is, force capable of causing physical pain or injury to another person."  *Johnson v. United States*, 559 U.S. 133, 140 (2010).

To determine whether a statute qualifies as a crime of violence, courts employ the "categorical" approach.  *United States v. St. Hubert*, 909 F.3d 335, 348 (11th Cir. 2018), *abrogated on other grounds by United States v. Davis*, 139 S. Ct. 2319 (2019).  Under this approach, courts compare the elements of the crime to the statutory definition, looking "only to the elements of the predicate offense statute" and not "at the particular facts of the defendant's offense conduct."  *Id.*  However, when a statute is "divisible" (defines multiple crimes), courts apply the "modified categorical approach" and may look "to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of."  *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016).

---

[2] The statute also contains a "residual clause," however the Supreme Court recently declared it unconstitutionally vague.  *United States v. Davis*, 139 S. Ct. 2319, 2336 (2019).

Section 111 provides:

> (a) In general.--Whoever--
>
> (1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties; or
>
> (2) forcibly assaults or intimidates any person who formerly served as a person designated in section 1114 on account of the performance of official duties during such person's term of service,
>
> shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both.
>
> (b) Enhanced penalty.--Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 111.  We have held that § 111 establishes "three separate crimes, the first two of which are contained in § 111(a), and the third in § 111(b)[,]" the "enhanced penalty" provision.  *United States v. Siler*, 734 F.3d 1290, 1296 (11th Cir. 2013).  Thus, the statute is divisible, and the modified categorical approach applies. The parties agree that Bates was convicted under § 111(b).

7

Still, Bates maintains that, even if § 111 is divisible, the enhanced penalty provision does not qualify as a crime of violence. We disagree. The enhanced penalty provision requires the government to prove that the defendant committed an act described in § 111(a) and, in doing so, the defendant *either*: 1) used a deadly/dangerous weapon *or* 2) inflicted bodily injury. *See id.* at 1296–97; 18 U.S.C. § 111(b). Each prong of § 111(b) transforms a § 111(a) act into a crime of violence.

Bates argues that "because simple assault, the foundation of a § 111(b) violation, does not include the element of physical force, no firearm or bodily injury can alone supply that element[.]" Yet, § 111(a) of the statute requires the defendant to act "forcibly." We have defined "forcible assault" as "any *willful threat or attempt to inflict bodily injury* upon the person of another when coupled with an apparent present ability to do so, and includes any intentional display of force such as would give the victim reason to fear or expect immediate bodily harm." *United States v. Fallen*, 256 F.3d 1082, 1087 (11th Cir. 2001) (quoting *United States v. Renfro*, 620 F.2d 497, 500 (5th Cir.1980)) (emphasis added). As the Sixth Circuit explained, "if a statute has as an element some degree of, or the threat of, physical force in the more general sense, then the use of a deadly weapon may transform this more general force into the necessary violent force to constitute a crime of violence within the meaning of *Johnson*[]." *United States v. Rafidi*, 829 F.3d 437, 446 (6th Cir. 2016)

8

(quotation marks omitted).[3] We agree. The *use* of a deadly weapon under § 111(b) transforms a § 111(a) act into a crime of violence.

Likewise, a forcible assault that results in bodily injury constitutes a crime of violence, as it necessarily requires the use of violent force. *See United States v. Taylor*, 848 F.3d 476, 494 (1st Cir. 2017) ("If a slap in the face counts as violent force under *Johnson* because it is capable of causing pain or injury a forcible act that injures does, too, because the defendant necessarily must have committed an act of force in causing the injury[.]") (internal citation and quotation marks omitted). Bates counters that "a simple assault in which the offender inflicts bodily injury on the federal agent, also does not satisfy the [elements] clause because it fails *Leocal*'s active employment standard." The crux of Bates's contention is that § 111(b) "does not require proof that the defendant intended to bring about the injury," and therefore, the statute could be violated without the active employment of force. However, Bates's argument ignores that the statute requires the defendant to act "forcibly" and, as discussed above, forcible assault means a "*willful* threat or attempt to inflict bodily injury." *Fallen*, 256 F.3d at 1087 (emphasis added). Bates does not explain how one may accidentally commit a forcible assault that results in bodily injury. The First Circuit rejected such an argument in *Taylor*, finding no support for

---

[3] This is true whether the defendant makes physical contact with the officer or simply threatens such contact. *See id.*

9

the assertion that "a defendant could be convicted of intentionally and forcibly assaulting, yet accidentally using a dangerous weapon or injuring, a federal employee." *Taylor*, 848 F.3d at 494 (emphasis omitted).  We reject the argument as well.  Using a firearm or causing bodily injury in the commission of a forcible assault qualifies as a crime of violence.

Thus, as five other circuits have held, § 111(b) categorically qualifies as a crime of violence under § 924(c)'s elements clause.  *See id.* at 491–95 (holding that § 111(b) qualifies as a crime of violence under the elements clause of § 924(c)); *Rafidi*, 829 F.3d at 446 (same); *United States v. Kendall*, 876 F.3d 1264, 1270 (10th Cir. 2017) (holding that § 111(b) qualifies as a crime of violence under the elements clause of the Guidelines in § 4B1.2(a)); *United States v. Hernandez–Hernandez*, 817 F.3d 207, 214–17 (5th Cir. 2016) (holding that § 111(b) qualifies as a crime of violence under the elements clause of the Guidelines in § 2L1.2); *United States v. Juvenile Female*, 566 F.3d 943, 947–48 (9th Cir. 2009) (holding that § 111(b) qualifies as a crime of violence under the elements clause of 18 U.S.C. § 16).

## II. Excluded Evidence

Next, Bates argues that the district court erred by excluding: 1) Dr. Tomina Schwenke's psychiatric testimony regarding Bates's mental state at the time he shot the officer, 2) Bates's hospitalization records from 2002, and 3) testimony regarding his statement to ATF Agent Kim Underwood.  Evidentiary rulings are reviewed for

10

abuse of discretion. *United States v. Magluta*, 418 F.3d 1166, 1177 (11th Cir. 2005). "Under the abuse-of-discretion standard, 'a district court's underlying legal conclusions are reviewed *de novo* and its factual findings for clear error.'" *United States v. $70,670.00 in U.S. Currency*, 929 F.3d 1293, 1300 (11th Cir. 2019) (quoting *Bradley v. King*, 556 F.3d 1225, 1229 (11th Cir. 2009)). "A district court abuses its discretion when it applies an incorrect legal standard, relies on clearly erroneous factual findings, or commits a clear error of judgment." *Id.*

### A. Psychiatric Testimony

The parties dispute whether psychiatric evidence is inadmissible *per se* in general-intent-crime prosecutions. This dispute raises important questions of law. Below, we address the principles governing the admissibility of psychiatric evidence and define the limited circumstances under which such evidence might be admissible in general-intent-crime prosecutions. However, even under our clarified framework, the district court did not abuse its discretion by excluding Dr. Schwenke's testimony.

### i. Admissibility of Psychiatric Evidence in General-Intent Prosecutions

In the vast majority of cases, psychiatric evidence is inadmissible to negate *mens rea* in general-intent prosecutions. Nonetheless, in rare circumstances, the government will be required to prove a heightened *mens rea* element to secure a conviction. In these rare cases, the *mens rea* element of a general-intent crime would

11

take on a "specific" nature susceptible to negation by psychiatric evidence. To best convey when these rare circumstances might arise, we must start with the Insanity Defense Reform Act of 1984 (the "IDRA"), 18 U.S.C. § 17.

The IDRA states:

> (a) Affirmative defense.--It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.
>
> (b) Burden of proof.--The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

18 U.S.C. § 17. The IDRA thus "eliminate[d] all other affirmative defenses or excuses based upon mental disease or defect." *United States v. Westcott*, 83 F.3d 1354, 1357–58 (11th Cir. 1996). In other words, "[t]hrough the Act, Congress intended to prohibit the presentation of evidence of mental disease or defect, short of insanity, to excuse conduct." *Id.* at 1358. However, while the IDRA prohibits psychiatric evidence to excuse or otherwise justify conduct, psychiatric evidence is still admissible where it negates the *mens rea* of a specific intent crime. *Id.*; *United States v. Cameron*, 907 F.2d 1051, 1061, 1064–66 (11th Cir. 1990). To be clear, "[e]vidence that a defendant lacks the capacity to form *mens rea* is to be distinguished from evidence that the defendant actually lacked *mens rea*. While the

12

two may be logically related, only the latter is admissible to negate the *mens rea* element of an offense." *Westcott*, 83 F.3d at 1358.  Where the defendant claims to have psychiatric evidence relevant to "an incapacity to reflect or control the behaviors that produced the criminal conduct[,] [s]uch evidence is not 'psychiatric evidence to negate specific intent' and should not be admitted." *Cameron*, 907 F.2d at 1066.

Further, in *Cameron*, we cautioned that:

[b]ecause psychiatric evidence (1) will only rarely negate specific intent, (2) presents an inherent danger that it will distract the jury's from focusing on the actual presence or absence of mens rea, and (3) "may easily slide into wider usage that opens up the jury to theories of defense more akin to justification," district courts must examine such psychiatric evidence carefully to ascertain whether it would, if believed, "support a legally acceptable theory of lack of mens rea."

907 F.2d at 1067 (internal citations omitted).

We have held that § 111 is a general intent crime regardless of the subsection at issue.  *See United States v. Ettinger*, 344 F.3d 1149, 1154–55 (11th Cir. 2003); *United States v. Feola*, 420 U.S. 671, 684 (1975) (holding that all § 111 "requires is an intent to assault, not an intent to assault a federal officer"); *see also United States v. Alvarez*, 755 F.2d 830, 842 (11th Cir. 1985) (explaining that all that § 111 requires is an intent to assault and "[k]nowledge of the victim's status as a federal officer is not an element of the federal crime of assault under 18 U.S.C. § 111").  Thus, in

13

*Ettinger*, we held that a diminished capacity defense to a § 111 charge is unavailable.

344 F.3d at 1155.

Nevertheless, although § 111 is a general intent crime and knowledge of the victim's status is not an element, in *Feola*, the Supreme Court noted that, in certain circumstances, the defendant's state of knowledge may be relevant because

> [t]he statute does require a criminal intent, and there may well be circumstances in which ignorance of the official status of the person assaulted or resisted negates the very existence of *mens rea*. For example, where an officer fails to identify himself or his purpose, his conduct in certain circumstances might reasonably be interpreted as the unlawful use of force directed either at the defendant or his property. In a situation of that kind, one might be justified in exerting an element of resistance, and an honest mistake of fact would not be consistent with criminal intent.

420 U.S. at 686. Accordingly, as we subsequently recognized in *Alvarez*, where a defendant raises a claim of self-defense to a § 111 charge, "the government might be required to prove that the defendant knew of the victim's federal status in order to obtain a conviction under [§ 111]."[4] 755 F.2d at 842, 844. Specifically, in *Alvarez* we noted that the government has two avenues available to rebut a defendant's self-defense argument. *Id.* at 843. The government may prove that the defendant either: 1) used an unreasonable amount of force, or 2) knew the victim was a federal agent. *Id.* Thus, where the facts show that the defendant used a reasonable amount of force,

---

[4] "Nevertheless, even a claim of self-defense based on lack of knowledge of the victim's federal status does not make knowledge an element of the crime under section 111." *Alvarez*, 755 F.2d at 843.

14

"the government might be able to negate the defendant's claim of self-defense *only* by proving that the defendant knew that his victim was a federal agent." *Id.* at 844. Consequently, in such an extraordinary case, non-insanity psychiatric evidence might be admissible for the limited purpose of negating the criminal intent required under § 111. In light of this clarification, the next question we must address in the case at hand is whether the district court erred in excluding Dr. Schwenke's testimony. It did not.

### ii.  Dr. Schwenke's Testimony

Here, the government sought to rebut Bates's self-defense claim by proving that he knew the victim was a federal officer. Theoretically, Bates may have been able to introduce non-insanity psychiatric evidence to negate the criminal intent required under § 111—but only if it would actually bear on his knowledge of the victim's status. At the trial, defense counsel acknowledged that Dr. Schwenke would not be able to testify that Bates's "thinking was rationally impaired." But, Bates argued that Dr. Schwenke could testify "about him having the diagnosis that he does" and that condition's effect on Bates. However, such testimony would not seem to advance Bates's self-defense argument that he did not know there were law-enforcement officers at his door. Dr. Schwenke's report states that:

> [T]he accumulative effects of multiple issues likely cloud Mr. Bates's reasoning abilities. These deficits appear to render Mr. Bates vulnerable particularly in highly emotional situations, such as what happened during the

15

instant offense.    Given the similar circumstances surrounding his prior trauma and the instant offense, it is likely that Mr. Bates re-experienced increased anxiety and had a heightened need to protect himself, which rendered his ability to think rationally impaired.

As defense counsel admitted, Dr. Schwenke went "just a step too far" in her report because she may not testify to Bates's alleged impaired "reasoning abilities" or ability to think rationally.    Such testimony would likely cross over into the "affirmative defense" category of psychiatric evidence, which, per the IDRA, is inadmissible to negate *mens rea* because it would excuse conduct based on a defendant's "inability or failure to engage in normal reflection."  *See Cameron*, 907 F.2d at 1066.    Moreover, Dr. Schwenke's broad observation, at most, shows that Bates was likely to react irrationally to *anyone* attempting to gain entry to his home, not, the conclusion that he did not know officers were at his door.    Without such a conclusion, even assuming one would be medically reliable, Dr. Schwenke's opinion that "[g]iven the similar circumstances surrounding his prior trauma and the instant offense, it is likely that Mr. Bates re-experienced increased anxiety and had a heightened need to protect himself," does not bear on whether Bates knew officers were at his door.    Dr. Schwenke would have to provide the "link" between Bates's condition and the likelihood that, at the time of the offense, Bates did not know he was shooting at law-enforcement officers.    Defense counsel proffered no such link

16

and the report contains no such link. Therefore, the district court did not abuse its discretion by excluding Dr. Schwenke's testimony.

### B. Hospital Records

Bates sought to introduce hospital records from 2002 which confirmed that he was treated for gunshot wounds to his mouth and back. Bates planned to have Dr. Schwenke relate the 2002 shooting to the instant case, but the district court excluded her testimony. Nevertheless, Bates argues that the records "even without testimony, should have been admitted as relevant to [his] statement in opening and because [they were] relevant to his defense that his actions on November 21, 2013 were affected by the prior shooting."

At trial, Bates argued that the 2002 shooting was relevant to his defense because the prior shooting changed his behavior, including making him more "paranoid," and this went to his "state of mind and the fact that he felt under these particular circumstances that he needed to discharge a weapon to protect his life." However, the hospital records merely report that Bates was treated for gunshot wounds; they do not indicate that Bates was the victim of a robbery or detail the circumstances surrounding the shooting. The fact that Bates was treated for gunshot wounds in 2002, without more, does not offer any insight into Bates's state of mind during the incident in this case. Moreover, the district court stated that it would have admitted the hospital records if Bates offered a witness who observed the alleged

17

changes in Bates's behavior following the 2002 shooting. Bates ultimately offered no such witness.[5] Consequently, the district court did not abuse its discretion by excluding the hospital records given that there was no witness to explain how the records related to the incident in this case.[6]

### C. Testimony of Agent Underwood

Bates argues that the district court abused its discretion by excluding his statement to ATF Agent Kim Underwood that he "had previously been robbed and did not know there were officers at his door." Bates acknowledges that this statement constitutes hearsay, but contends that the statement is admissible under two exceptions to the hearsay rule: excited utterance and present sense impression. Under Rule 803 of the Federal Rules of Evidence, a present sense impression is "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). An excited utterance is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2).

---

[5] After initially offering his brother as a witness, Bates informed the district court that his brother would not testify and offered no other witnesses.

[6] Bates cites to *United States v. Wilk* to support his argument that the hospital records could have been admitted without a testifying witness. 572 F.3d 1229 (11th Cir. 2009). However, *Wilk* does not support such a proposition. In *Wilk*, this Court held that the district court did not abuse its discretion by admitting medical records referenced in expert witness testimony and denying the defendant's motion to suppress evidence and testimony relating to his medical records on the grounds that the records were protected by Florida's patient-psychotherapist privilege and HIPAA. *Id.* at 1236.

The district court observed that "the excitement seems to have ended, and then [Bates] makes the statement [to Agent Underwood]."  We agree. Bates's statement does not qualify as an excited utterance because he was not "under the stress of excitement" when he made the statement.  Specifically, while Bates was clearly in an excited state during the 9-1-1 call, he made no similar statement while speaking with the 9-1-1 operator, while being arrested, while being calmed down after being arrested, or while being escorted to the patrol car.  By the time Bates reached the patrol car and made this statement, it is improbable that, as Bates argued at trial, the "physical altercation as he's being arrested is what led to this statement[.]"  Similarly, the statement was not a present sense impression because it was not "made while or immediately after [Bates] perceived" the event.  While the statements he made on the 9-1-1 call were "made while or immediately after [Bates] perceived" the event, the later statement to Agent Underwood is simply too far removed to be a present sense impression.  Thus, the district court did not abuse its discretion by finding that Bates's statement did not meet either hearsay exception. Moreover, even assuming *arguendo* that exclusion of this testimony was error, it did not affect Bates's substantial rights because his belief that someone was trying to break into his home was admitted through the 9-1-1 recording.  *United States v. Abreu*, 406 F.3d 1304, 1306 (11th Cir. 2005) ("[e]videntiary errors do not constitute grounds for a reversal unless there is a reasonable likelihood that they affected the defendant's

19

substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." (quoting *United States v. Drury*, 396 F.3d 1303, 1315 (11th Cir. 2005)).

### III.  Sufficiency of Evidence

Bates argues that the district court erred by denying his motion for judgment of acquittal on the § 111 and § 924(c) counts because there was insufficient evidence to prove beyond a reasonable doubt that he did not act in self-defense.  The government counters, arguing that a reasonable jury could find, and did find, that there was sufficient evidence to show that Bates knew he was shooting at law-enforcement officers, which rebuts Bates's self-defense claim.  We agree.

We review the denial of a motion for judgment of acquittal *de novo*, "applying the same standard used in reviewing the sufficiency of the evidence[.]"  *United States v. Descent*, 292 F.3d 703, 706 (11th Cir. 2002).  We review a challenge to the sufficiency of the evidence *de novo* to "determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt."  *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008).  The evidence is viewed "in the light most favorable to the government and all reasonable inferences and credibility choices are made in the government's favor."  *Id.*  To uphold the denial of a motion for judgment of acquittal, "we need only determine that a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a

20

reasonable doubt." *Descent*, 292 F.3d at 706 (quoting *United States v. Hansen*, 262 F.3d 1217, 1236 (11th Cir. 2001)).

Here, there is sufficient evidence for a jury to reasonably find that Bates did not act in self-defense. To rebut Bates's self-defense claim, the government offered evidence to show that Bates knew his victim was a law-enforcement officer. This evidence included: testimony that, prior to their entry, the officers shouted "police" multiple times; testimony that, prior to the officers' entry, one officer saw movement in the house, from which a reasonable jury could infer that Bates was awake and heard the officers' shouts; testimony that a police car had its lights flashing which could be seen from the living room; a recording of the 9-1-1 call in which Bates states "the police at my door," and in which the officers are heard yelling, indicating that Bates would have been able to hear the team's shouts. Thus, there was sufficient evidence for a jury to find Bates did not act in self-defense. Accordingly, we find no error in the district court's denial of Bates's motion for denial of acquittal.

## IV. Challenges to Sentence

Bates challenges his sentence on three grounds. First, Bates contends that his prior Georgia convictions for possession with intent to distribute marijuana do not qualify as "serious drug offenses" or "controlled substance offenses." Second, Bates argues that he was entitled to a two-level reduction for acceptance of responsibility.

21

Third, Bates asserts that a 360-month sentence is substantively unreasonable.  We will address each in turn.

## A.  Bates's Georgia Convictions

Bates argues that the district court erred in determining that his Georgia convictions for possession with intent to distribute marijuana qualified as "serious drug offenses," under the ACCA, and "controlled substance offenses," under the Guidelines.  Specifically, Bates argues that the Georgia statute, O.C.G.A. § 16-13-30(j)(1), is broader than the federal definitions, and, thus, his convictions under that statute fail the categorical test.  Bates's claim that the Georgia statute sweeps more broadly than the federal generic offense is foreclosed by the Supreme Court's recent decision in *Shular v. United States*, 589 U.S. ___, 140 S. Ct. 779, 782 (2020), which held that the ACCA's "'serious drug offense' definition requires only that the state offense involve the conduct specified in the federal statute; it does not require that the state offense match certain generic offenses."  Thus, all we must determine here is whether Bates's Georgia convictions categorically involve the conduct specified in the federal statute.  *See id.*

Whether a conviction qualifies as a serious drug offense under the ACCA or a controlled substance offense under the Guidelines is reviewed *de novo*.  *United States v. White*, 837 F.3d 1225, 1228 (11th Cir. 2016) (standard of review for serious

22

drug offense under ACCA); *United States v. Lange*, 862 F.3d 1290, 1293 (11th Cir. 2017) (standard of review for controlled substance offense under the Guidelines).

For purposes of the ACCA, a "serious drug offense" is "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) for which a maximum term of imprisonment of ten years or more is prescribed by law."  18 U.S.C. § 924(e)(2)(A)(ii).  Similarly, under the Sentencing Guidelines, a "controlled substance offense" is defined as "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance . . . or the possession of a controlled substance . . . with intent to manufacture, import, export, distribute, or dispense."  U.S.S.G. § 4B1.2(b).

O.C.G.A. § 16-13-30(j)(1) makes it "unlawful for any person to possess, have under his or her control, manufacture, deliver, distribute, dispense, administer, purchase, sell, or possess with intent to distribute marijuana."  The statute lists simple "possession" of marijuana and "possession with intent to distribute" in the disjunctive, which indicates that they are elements in the alternative (*i.e.* separate offenses).  *See* O.C.G.A. § 16-13-30(j)(1).  Accordingly, O.C.G.A. § 16-13-30(j) is divisible such that the modified-categorical approach applies.

23

Applying the modified-categorical approach, Bates's PSI indicates that his two prior Georgia convictions were for possession with intent to distribute marijuana, not mere possession. Accordingly, the elements of Bates's convictions align with the conduct specified in the ACCA's and the Guidelines' definition of a serious drug offense and a controlled substance offense, respectively. Consequently, Bates's prior Georgia convictions for possession of marijuana with intent to distribute qualified as predicate offenses for both the ACCA and the Guidelines. *Shular*, 589 U.S. at ___, 140 S. Ct. at 782.

### B. Denial of Two-Level Reduction

Bates next argues that the district court erred in denying him a two-level reduction for acceptance of responsibility by pleading guilty to the possession charges (Counts 3 and 5). We review a district court's determination that a defendant has not accepted responsibility for clear error. *United States v. Knight*, 562 F.3d 1314, 1322 (11th Cir. 2009). We give "great deference on review" to such a finding, and the district court's determination "should not be disturbed unless it is without foundation." *Id.* (quoting *United States v. Davis*, 878 F.2d 1299, 1301 (11th Cir. 1989)).

The Guidelines instruct the sentencing judge to reduce the offense level by two levels if the defendant "*clearly demonstrates* acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a) (emphasis added). The "adjustment is not intended

24

to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." *Id.* at § 3E1.1 cmt. (n.2).

Bates did not accept responsibility—he pleaded guilty to only two of the five counts. Thus, Bates put the government to its burden on the three remaining counts. Moreover, as the district court observed, even his two guilty pleas "were entered . . . more as a benefit to Mr. Bates than under any acceptance of responsibility." As such, the district court did not clearly err by denying Bates a two-level reduction for acceptance of responsibility. *See United States v. Thomas*, 242 F.3d 1028, 1034 (11th Cir. 2001) (holding that "acceptance of responsibility is all or nothing under § 3E1.1. A defendant who fails to accept responsibility for all of the crimes he has committed and with which he has been charged is entitled to nothing under § 3E1.1.").

## C. Substantive Reasonableness of Sentence

Finally, Bates argues that his low-end of the Guideline range sentence of 360 months is substantively unreasonable. Essentially, Bates contends that the district court weighed his criminal history too heavily and failed to consider other factors, including Bates's claims that he: acted in self-defense, had been traumatized in 2002, had only served light sentences for his prior convictions, and had accepted

25

responsibility by pleading guilty to two counts.  We find no merit in Bates's contentions.

The Supreme Court has stated that "courts of appeals must review all sentences—whether inside, just outside, or significantly outside the Guidelines range—under a deferential abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 41 (2007).  We will vacate a sentence for substantive unreasonableness only if we are "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Whyte*, 928 F.3d 1317, 1338 (11th Cir. 2019) (quoting *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (*en banc*)).  "A district court's sentence need not be the most appropriate one, it need only be a reasonable one." *Id.* (quoting *Irey*, 612 F.3d 1191).

The district court here did not abuse its discretion by imposing a low-end Guideline sentence.  As an initial matter, Bates is incorrect in asserting that the district court did not consider the other factors he raises on appeal.  At the sentencing hearing, the district court heard arguments and testimony regarding the nature of Bates's prior sentences, his purported acceptance of responsibility for his two guilty pleas, and Bates's assertion that, because he was traumatized by the 2002 incident, he acted in self-defense.  However, the district court considered the "key issue" to

26

be Bates's criminal history of multiple prior felonies, most of which were drug related, one of which involved a firearm, and another a knife. The district court noted that Bates had been "given may chances," but continued to reoffend, with his crimes "escalat[ing] over the years." After weighing these factors, the district court sentenced Bates, not just within the Guideline range, but to the low-end of the range. "We ordinarily expect that a sentence within the Guidelines is reasonable" and Bates has not met his burden to show otherwise. *See Whyte*, 928 F.3d at 1338. Therefore, the district court did not abuse its discretion.

## V. *Rehaif* Challenge

In light of the Supreme Court's decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), Bates asks the Court to vacate his conviction for being a felon in possession of a firearm. We review this claim for plain error. *United States v. Reed*, 941 F.3d 1018, 1021 (11th Cir. 2019).

In *Rehaif*, the Supreme Court held that 18 U.S.C. § 922(g), when read in conjunction with § 924(a)(2), requires not only that the defendant know that he possesses a firearm, but also know of his status prohibiting him from doing so, *i.e.* in Bates's case, know that he is a felon. *See Rehaif*, 139 S. Ct. at 2195–96. Bates contends that because his indictment omitted a *mens rea* element and failed to reference § 924(a)(2), which contains the *mens rea* element, the district court was without jurisdiction to accept his guilty plea. Of course, jurisdictional defects are

27

not waived by a guilty plea. *See United States v. Peter*, 310 F.3d 709, 712 (11th Cir. 2002). However, we recently held that the same *Rehaif*-based defect of which Bates complains, is non-jurisdictional. *See United States v. Moore*, 954 F.3d 1322, 1332–37 (11th Cir. 2020). In reaching this conclusion, we distinguished *Peter*, the primary case on which Bates relies, noting that based on a Supreme Court decision entered after Peter's plea, his indictment no longer charged a crime, which is different from simply omitting an element or "an allegation requisite to liability." *Id.* (quoting *Peter*, 310 F.3d at 715. Specifically, Peter's guilty plea to a RICO conspiracy predicated on mail fraud was based on his admission that he misrepresented license applications that he mailed to a Florida agency, but subsequent to his plea, the Supreme Court held that "'state and municipal licenses . . . [are] not "property" for purposes of [the mail fraud statute].'" *Id.* at 711 (quoting *Cleveland v. United States*, 531 U.S. 12, 15 (2000)). Thus, in light of *Cleveland*, Peter's indictment, which was based on allegations that he misrepresented state license applications, charged no crime at all, rendering the defect jurisdictional. *Id.* at 715. Unlike *Peter*, however, the appellants in *Moore*—and now Bates here—challenged the omission of *Rehaif*'s *mens rea* element, and "[t]he absence of an element of an offense in an indictment is not tantamount to failing to charge a criminal offense against the United States." *Moore*, 954 F.3d at 1333; *United States v. Brown*, 752 F.3d 1344, 1354 (11th Cir. 2014) (holding "that the omission from indictment of an element of the charged

28

offense is a non-jurisdictional defect"); *see also United States v. Balde*, 943 F.3d 73, 92 (2d Cir. 2019) (holding the omission of *mens rea* element in indictment charging only § 922(g) was "not a jurisdictional defect"). To be clear, "[s]o long as the indictment charges the defendant with violating a valid federal statute as enacted in the United States Code, it alleges an 'offense against the laws of the United States' and, thereby, invokes the district court's subject-matter jurisdiction." *Brown*, 752 F.3d at 1354 (quoting *Alikhani v. United States*, 200 F.3d 732, 734–35 (11th Cir. 2000)).

However, a guilty plea does not waive all challenges to the plea itself, and a defendant can still attack the "the voluntary and knowing nature of the plea." *Wilson v. United States*, 962 F.2d 996, 997 (11th Cir. 1992). In order for a plea to be knowing and voluntary, "[the] court accepting a guilty plea must comply with [Fed. R. Crim. P.] 11 and specifically address three 'core principles,' [including] ensuring that a defendant . . . understands the nature of the charges." *United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005). Because Bates did not raise an objection below, we review for plain error. *United States v. Davila*, 569 U.S. 597, 607 (2013). Therefore, Bates must show "a reasonable probability that, but for the error, he would not have entered the plea." *Id.* (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004)). Bates fails to demonstrate such a probability.

At the plea hearing and at his sentencing, Bates did not object to or express any confusion about the government's assertion that he was a seven-time convicted felon. Indeed, unlike in *Rehaif*, Bates does not assert that he was unaware of his qualifying status. Had the government been required to prove that Bates knew he was a felon at the time he possessed a firearm, there is overwhelming evidence to show that it would have easily done so. As the Supreme Court stated in *Rehaif*, the government's obligation to prove knowledge is not "burdensome," as "knowledge can be inferred from circumstantial evidence." *Rehaif*, 139 S. Ct. at 2198 (quoting *Staples v. United States*, 511 U.S. 600, 615, n.11 (1994)). Had Bates known that the government needed to prove that he knew he was a felon, the probability is virtually zero that it would have changed his decision to plead guilty. *See, e.g.*, *United States v. Burghardt*, 939 F.3d 397, 404 (1st Cir. 2019) (rejecting *Rehaif* challenge to guilty plea where there was "overwhelming proof that [defendant] knew that he had previously been convicted of offenses punishable by more than a year in prison"). This is especially true here because, as the district judge noted, Bates's decision to plead guilty to the felon-in-possession charge was a "smart strategic move," presumably to ensure that the jury was unaware that Bates was a convicted felon. Bates's logic remains the same post-*Rehaif*. Bates cannot credibly contend that he would have changed his decision to plead guilty and, instead, have opted for the

30

government to prove that he knew he was a felon by offering evidence related to all seven of his prior convictions.

Therefore, *Rehaif* does not require vacating Bates's conviction for possessing a firearm as a felon.

## CONCLUSION

For the foregoing reasons, we affirm Bates's convictions and sentence.

**AFFIRMED.**